

**WILCOX & FETZER LTD.**

In the Matter Of:

# Anderson
v.
# General Motors Corporation

C.A. # 05-877 JJF

--------------------------------------------------------------

Transcript of:

Roland C. Anderson

October 24, 2007

--------------------------------------------------------------

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

EX. 1

Anderson v. General Motors Corporation

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROLAND C. ANDERSON,         )
                            )
        Plaintiff,          )
                            )  Civil Action
    v.                      )  No. 05-877 JJF
                            )
GENERAL MOTORS CORPORATION, )
                            )
        Defendant.          )

Deposition of ROLAND C. ANDERSON taken pursuant
to notice at the law offices of Eckert, Seamans, Cherin &
Mellott, LLC, 300 Delaware Avenue, Suite 1210,
Wilmington, Delaware, beginning at 9:20 a.m. on
Wednesday, October 24, 2007, before Eleanor J. Schwandt,
Registered Merit Reporter and Notary Public.

APPEARANCES:

    ROLAND C. ANDERSON, Pro Se

    MICHAEL A. WILLIAMS, ESQ.
    LATHROP & GAGE, L.C.
    2345 Grand Boulevard - Suite 2800
    Kansas City, Missouri 64108-2612
        for the Defendant

ALSO PRESENT:

    DIANE GRAHAM, General Motors Corporation
    People Systems Manager

        WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
        (302) 655-0477
        www.wilfet.com

**Page 2**

1     (Anderson Deposition Exhibits 1, 2 and 3 were
2  marked for identification.)
3         - - - - -
4         ROLAND C. ANDERSON,
5     the witness herein, having first been
6     duly sworn on oath, was examined and
7     testified as follows:
8         EXAMINATION
9  BY MR. WILLIAMS:
10     Q.   Can you please state your full name for the
11  record?
12     A.   Roland C. Anderson.
13     Q.   Mr. Anderson, what is your date of birth?
14     A.   6/12/52.
15     Q.   And what is your current address?
16     A.   113 Lloyd Street, L-L-O-Y-D, Wilmington,
17  Delaware, 19804.
18     Q.   And how long have you lived at that address?
19     A.   About close to 26 years.
20     Q.   And is that a home or an apartment?
21     A.   Home.
22     Q.   And do you own that home or rent it?
23     A.   I own it.
24     Q.   And what is your Social Security number?

**Page 3**

1     A.   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.
2     Q.   Now, have you ever been known as any other names
3  other than Roland Anderson?
4     A.   Roland Anderson.  You can put C in there,
5  Charles.  That's my middle initial.
6     Q.   Have you had any other Social Security numbers
7  besides 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?
8     A.   No, by state record.
9     Q.   Mr. Anderson, my name is Michael Williams.  I'm a
10  partner at the law firm of Lathrop & Gage in Kansas City,
11  Missouri, and we have been hired to represent General
12  Motors with regard to, in fact, two complaints that you
13  have filed against General Motors.
14         Are you aware of these facts?
15     A.   Yes.
16     Q.   And because you are here alone and don't have
17  counsel, I'm going to make sure that I explain the rules
18  to you very carefully so that we are all on the same page
19  from the beginning.
20         To my left are seated two court reporters.
21     A.   Okay.
22     Q.   And the court reporter's job is to take down
23  everything that I say and every answer that you give.
24  Because of that fact, she can't have me talking over you,

**Page 4**

1  and likewise, she can't have you talking over me, which
2  means I have to be allowed to finish my question and then
3  I have to give you a chance to finish your answer before
4  I start the next question.
5     A.   Okay.
6     Q.   You are doing a good job of it right now, and one
7  of the things that it is hard for us to do is most people
8  talk with their hands, and in a deposition she can only
9  take down the things that are said.
10         So to the extent that you have an answer, it
11  has to be aloud, and it has to be a yes or a no, and
12  because uh-huh and mm-hmm are words we commonly use but
13  they don't have any legal meaning, so if you do that, I
14  have to ask, was that a yes or was that a no to make sure
15  we keep the record clear.
16         Do you understand those things?
17     A.   Yes.
18     Q.   Do you also understand that you are here under
19  oath and that what you give here is sworn testimony that
20  can be used just as if you were testifying in front of a
21  judge or a jury at this point?
22     A.   Okay.
23     Q.   Finally, we have to make sure that you are
24  competent to testify, meaning:  Are you under the

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 5

1  influence of any alcohol, medication, or drugs that would
2  affect your ability to be truthful and honest here today?
3      A.  Well, I take medication for sugar diabetes.
4      Q.  What medication do you take?
5      A.  Gilgicte.  Gilgicte.
6      Q.  You probably have to spell that just to make
7  sure.
8      A.  G-I-L-G-I-C-T-E.
9      Q.  Are you under any other medication?
10     A.  I take lovustatin for cholesterol.  Lovustatin.
11     Q.  Is there any other medication?
12     A.  I take aspirin.
13     Q.  Okay.  Now, you have taken these medications in
14  the past, correct?
15     A.  Yes.
16     Q.  And on any of those occasions have they affected
17  your ability to understand questions you are being asked
18  and to answer in a truthful and honest manner?
19     A.  Not that I know of.  To be truthful with you, I
20  never really went through a deposition, so no.
21     Q.  Okay.  And as you sit here today, do you have any
22  reason to believe that you can't be truthful and honest?
23     A.  I'm being truthful from what the documents, what
24  happened, and what was presented from General Motors and

Page 6

1  I have a statement here from Dave Bull.
2      Q.  Okay.  But, sir, the question is:  Are you
3  capable of being truthful and honest here today?
4      A.  Yes.
5      Q.  We just have to make sure that you are competent
6  to testify.  That's a legal requirement before we go any
7  further.
8      A.  All right.
9      Q.  Are you sleep deprived in a manner that would
10  prevent you from being truthful and honest here today?
11     A.  No.
12     Q.  And are you under the influence of alcohol or any
13  illegal narcotic at this time?
14     A.  No.
15     Q.  Mr. Anderson, did you graduate from high school?
16     A.  Yes.
17     Q.  And what high school did you graduate from?
18     A.  McKean High School.
19     Q.  And where is that at?
20     A.  That's in Hockessin, Delaware.
21     Q.  Is that Hope Castle?
22     A.  Hockessin.
23     Q.  Do you remember what year you graduated?
24     A.  That was in '71.

Page 7

1      Q.  Now, after you graduated from high school, did
2  you attend any college, university, or trade school?
3      A.  Yeah.  I went to Del Tech, took up retail sales
4  and also Delcastle for becoming an electrician.
5      Q.  Any other colleges, schools, or universities that
6  you've attended?
7      A.  No.
8      Q.  Have you taken any on-line college courses?
9      A.  No.
10     Q.  You told me you attended Del Tech; is that
11  correct?
12     A.  Del Tech.
13     Q.  In what years did you attend Del Tech?
14     A.  Oh, that was some time in '84 to '86 or '87,
15  around that period, in the eighties.
16     Q.  Did you get a degree from Del Tech?
17     A.  Yes, I did.
18     Q.  And what kind of degree was it?
19     A.  Electrical trades.
20     Q.  Was that a certificate?  An associate's degree?
21  A bachelor's degree?
22     A.  That was a certificate for technical electricity.
23  You had to go through four years of courses to become an
24  electrician.

Page 8

1      Q.  And did you become a certified electrician?
2      A.  Well, I got my certificate and I worked as a
3  journeyman.  I was working as an electrician for 11 years
4  before I came to General Motors, and I tried to get a job
5  with General Motors in that field, but I was denied.
6      Q.  Okay.  What years did you work as a journeyman
7  electrician?
8      A.  That was from -- from the eighties up until '82.
9  I'm sorry.  Wait a minute.  From -- I started '71,
10  school, sometimes in the eighties to '82, to General
11  Motors is when I started back up General Motors.  About
12  ten -- ten, 11 years.
13     Q.  Okay.  I'm confused.  You graduated from high
14  school in '71?
15     A.  That's correct.
16     Q.  The first college, university, or trade school
17  you attended was Del Tech, correct?
18     A.  That's correct.
19     Q.  And you attended Del Tech 13 years after you got
20  out of high school?
21     A.  No.  No.
22     Q.  Because your prior testimony is that you went
23  from Del Tech to --
24     A.  It was '71 I graduated from school.

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 9

1    Q.   Okay.
2    A.   Then I went to Del Tech technical school to get
3  my certificate. Shortly after that, I worked as an
4  electrician clear up until '82, as I stated, when I
5  started working at General Motors up until '82.
6    Q.   Right after high school you went to Del Tech?
7    A.   Yes, shortly.
8    Q.   You would have started in Del Tech in '71 or '72?
9    A.   Right.
10   Q.   Not '84? It would be '71 or '72?
11   A.   It was in the seventies -- don't get me confused.
12 In the seventies, after I graduated from high school, I
13 went to trade school, Del Tech. Then I worked like 11
14 years up until '82, that's when I came to General Motors.
15 Okay. So that's about ten, 11 years from '77, '71 up
16 until '82.
17   Q.   Okay. So let's back up. From 1971 to 1982 is an
18 11-year period?
19   A.   Right.
20   Q.   Correct?
21   A.   That's right.
22   Q.   If you took four years to get a degree, that
23 would only leave seven years of work.
24   A.   See, I was still working in the field as I was

Page 10

1  going to school.
2    Q.   Okay. So while you were in trade school, you
3  were working as an electrician?
4    A.   Right, night school at Delcastle as an
5  electrician training, but I was working as an apprentice
6  during the daytime.
7    Q.   Okay. Then that will explain it better. So just
8  so the record is clear, you graduated from high school in
9  1971; is that correct?
10   A.   That's correct.
11   Q.   After you completed high school, you began
12 attending night classes at Del Tech to become an
13 electrician?
14   A.   That's correct.
15   Q.   During the time that you were going to night
16 school as an electrician, you worked as an apprentice
17 electrician; is that correct?
18   A.   That's correct.
19   Q.   And that time period would take us from 1971 up
20 until approximately 1982; is that correct?
21   A.   In '82, right.
22   Q.   It took you approximately four years to complete
23 your course work at Del Tech?
24   A.   Del Tech, that's what the requirement was for

Page 11

1  becoming an electrician, apprentice, trade school.
2    Q.   And after you completed your training at Del
3  Tech, you received a certificate?
4    A.   That's correct.
5    Q.   And that was an electrician certificate? Or what
6  was the title of the certificate you received?
7    A.   Certificate just stating that you finished the
8  course.
9    Q.   You also indicated that you attended college
10 trade school or a university called Delcastle?
11   A.   No, it wasn't university. It is Del Tech. It is
12 a school located in Wilmington here on 4th Street. It is
13 a secondary college or something like that.
14   Q.   Okay. So did you attend two different colleges?
15   A.   Well, yeah. One period I started to become a
16 retail salesman, and that was in the seventies. And I
17 decided to become an electrician instead. That's the
18 reason why I went to school, night work and high school.
19   Q.   Did you take courses to become a retail salesman?
20   A.   About six months to a year, something like that
21 at Del Tech.
22   Q.   Where did you take those courses?
23   A.   Del Tech Community College.
24   Q.   So both of your certificates or all class work

Page 12

1  was done at Del Tech?
2    A.   No, one was at trade school, Delcastle. The
3  other one was at Del Tech Community College. That's for
4  the retail salesman. Okay.
5    Q.   Del Tech was retail sales; Delcastle was
6  electrician?
7    A.   Delcastle trade school. You are getting me
8  confused.
9    Q.   Okay. Did you ever work as a retail salesperson?
10   A.   No. I just -- like I said, I just went from
11 there to trade school.
12   Q.   Okay. And so you worked as an electrician for
13 approximately 11 years; is that correct?
14   A.   That's correct.
15   Q.   And during that 11-year period from '71 to 1982,
16 did you have any other employment other than working as
17 an electrician?
18   A.   Okay. I used to work for Delcastle at nighttime,
19 nighttime at Delcastle as a custodian while I was getting
20 my education.
21   Q.   And how long were you a custodian at Delcastle?
22   A.   I worked there like ten years.
23   Q.   What were your hours there?
24   A.   From 10:00 to 7:00 in the morning.

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 13

1    Q.  10:00 p.m. to 7:00 a.m.?
2    A.  Yes.
3    Q.  How many days a week?
4    A.  Every day, every night.
5    Q.  You worked seven days a week?
6    A.  Seven days a week.
7    Q.  And why did you leave that job?
8    A.  Well, I was discriminated against.  They accused
9  me of assaulting someone and the guy lied.  And it was at
10  court 10.  I have documentations to that.  And the
11  charges were dismissed because he said that I had
12  assaulted him, which I didn't assault him, and he turned
13  around and dropped the charges.
14    Q.  So you were a custodian at Delcastle, and you
15  were a student or a co-worker charged you with assault?
16    A.  It was a co-worker.
17    Q.  Okay.  And that co-worker was in the
18  janitorial --
19    A.  Yeah.
20    Q.  What was his name?
21    A.  His name is Mr. William Fulst.
22    Q.  And you were terminated because of the assault?
23    A.  Yeah.  I was terminated because of that assault,
24  illegal assault.

Page 14

1    Q.  And after you were terminated, Mr. Fulst kept
2  pressing charges against you?
3    A.  No.  He dropped the charges.  I have a statement
4  from the Court 10, the charges were dropped.
5    Q.  You have a statement from whom?  I'm sorry.
6    A.  Court 10.  Justice of the Peace Court 10.
7    Q.  Okay.
8    A.  Do you know which Court 10 is, Justice of the
9  Peace, Court 10?
10    Q.  Your system is completely different than the one
11  we have in Missouri?
12    A.  Court 10.  Don't you have justices over there?
13    Q.  No.  We have Circuit Court judges, magistrate
14  judges, and Associate Circuit Court judges.
15    A.  That's like magistrate court.
16    Q.  Okay.  So after you were terminated from your
17  employment, did you file any charges or lawsuits against
18  Delcastle?
19    A.  Yes, I did.
20    Q.  And what were your charges based on?
21    A.  Violation of -- discrimination.  The attorney
22  that represented me in that was Mr. -- What is his name?
23  Steve Dryden.
24    Q.  And what happened with that case?

Page 15

1    A.  It was settled out of court.
2    Q.  Did you receive any money for that settlement?
3    A.  Yes, I did.
4    Q.  How much?
5    A.  I would rather not disclose that.  I think that's
6  confidential.  You can call Steve Dryden on that.  If he
7  wants to give that to you...
8    Q.  So you signed a confidentiality agreement with
9  regard to that settlement?
10    A.  I believe so.  I have to check the records.  It
11  has been back in 1982 somewhere.
12    Q.  Okay.  You also said during that 1971 to 1982
13  time period you worked as a journeyman electrician?
14    A.  That's right.
15    Q.  Who did you work for as an electrician?
16    A.  I worked for East Coast Electric.
17    Q.  And --
18    A.  Paul Nichols.
19    Q.  Is that a different company?
20    A.  Yes, different.  These are different companies.
21  John Stalls Electrical Contractors.  And I think that's
22  about it.  I better check my records.  As far as I can
23  recollect, those are the main three I worked for.
24    Q.  What records would you have to check to make sure

Page 16

1  that's accurate?
2    A.  The employment records or records I got at home.
3  But I did work for those, those main three right there.
4    Q.  Why did you leave East Coast Electric?
5    A.  Because by that time I -- I went to General
6  Motors.
7    Q.  Okay.  So for how long did you work for East
8  Coast Electric?
9    A.  About close to a year.  In '82, somewhere around
10  that time, '80 or '82.
11    Q.  What about Paul Nichols, how long did you work
12  there?
13    A.  About the same.
14    Q.  And why did you leave Paul Nichols?
15    A.  I forget.  You ask me questions way back, years
16  ago.  I can't recollect.  But I think I just went to John
17  Stalls.  That's where I did most of my electrical service
18  at.
19    Q.  And how long did you work for John Stalls?
20    A.  About eight, nine years, somewhere like that.
21    Q.  Did you resign from John Stalls or were you
22  terminated?
23    A.  I was laid off.
24    Q.  Did you sue any of these three employers that we

EX.    1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 17

1  discussed?
2      A.  No.
3      Q.  So you never filed any lawsuit against East Coast
4  Electric, Paul Nichols, or John Stalls Electric?
5      A.  No.
6      Q.  Did you ever file any charges of discrimination
7  against them?
8      A.  No.  Well, they didn't discriminate.  They just
9  laid me off because the work got slow, you know.
10     Q.  Now, were you a part of a union in this time
11 period from 1971 through 1982?
12     A.  Yeah.  I belonged to the AFSCME, federal union.
13 AFSCME federal union.
14     Q.  And that was related to which employer?
15     A.  Delcastle.
16     Q.  Now, after you settled your lawsuit, did you ever
17 go back to work at Delcastle?
18     A.  From that point I went to General Motors in '82.
19     Q.  Okay.  But did you ever go back and work at
20 Delcastle?
21     A.  No.
22     Q.  Are you still a member of the AFSCME federal
23 union?
24     A.  Yes.

Page 18

1      Q.  How long have you been a member of that union?
2      A.  I would say about nine, nine years, something
3  like that.
4      Q.  When did you join the union?
5      A.  Well, I joined the union way back in 80 -- '71.
6  And up until '82 I was illegally terminated, and sometime
7  shortly or sometime in the eighties I rejoined back with
8  the union.
9      Q.  And then you continued to be a member of the
10 union?
11     A.  Yeah, mm-hmm.
12     Q.  Okay.  And we have talked about your education
13 and employment up to 1982.
14     A.  Yeah.
15     Q.  In 1982 you applied for employment at General
16 Motors; is that correct?
17     A.  That's correct.
18     Q.  What position were you hired for?
19     A.  I was hired as -- on the production line.  I also
20 filed an application to become an electrician, but they
21 denied me the right to become an electrician as a
22 trademan.
23     Q.  How long did you work on the production line?
24     A.  It is about only four months.  But with the

Page 19

1  time for time, it added up to like six months.  See?
2  They go time for time.  If you have four months in, you
3  get time for time, meaning matching the four months that
4  you already accumulated.  So that's a total of like eight
5  months.
6          Do you understand what I'm saying how that
7  works, the collective bargaining unit.
8      Q.  Okay.  Stop.  I need you to answer my questions.
9      A.  Okay.
10     Q.  And then if you want to talk about the collective
11 bargaining agreement later, we can.
12          On what date were you hired first to work at
13 General Motors?
14     A.  Okay.  The first date says here was August the
15 31st of -- to September, September the 21st.
16     Q.  Of what year?
17     A.  They got here '81, but it is supposed to have
18 been '82.
19     Q.  Okay.
20     A.  See right here it says '82.  I'm just saying what
21 the situation is, documentation, from the records from
22 General Motors.  Okay.  I was reading what is here.  You
23 asked me a question.  I'm going to answer it.
24          So plaintiff was rehired on --

Page 20

1      Q.  Sir, you understand that this is your deposition?
2      A.  I understand that.
3      Q.  And one of the things that you have to do in your
4  deposition is you have to answer questions to the best of
5  your recollection.
6      A.  That's what I'm doing.  You asked me a question.
7  You asked me a question.
8      Q.  Do you understand that?
9      A.  You asked me a question when was I hired.  I'm
10 telling you from what the records says.
11     Q.  Sir, do you understand you have to answer
12 questions from the best of your recollection?
13     A.  Yes, but I'm trying to say to you --
14     Q.  Sir, do you understand you have to answer
15 questions from the best of your recollection?
16     A.  Okay.
17     Q.  Yes?
18     A.  Yes, but that wasn't explained to me at first.
19     Q.  Okay.  To the extent that you want to dispute
20 something that Mr. Bull or someone from General Motors
21 you believe said that's completely different than what
22 I'm asking you, I'm asking you for your memory and your
23 thoughts as to what happened during your employment.
24          To the extent we go through documents later,

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 21

1 you can explain what is right or wrong about
2 Mr. Bull's affidavit or anybody else's.
3          For the court's reference, the deponent is
4 reading from, I guess, an exhibit that he brought with
5 him which is --
6     A.  My employment.
7     Q.  -- an affidavit by Mr. Bull.
8          So I'm going to ask you again so the record
9 reflects what you recall when were you hired by General
10 Motors.
11    A.  '82.
12    Q.  Do you remember when in '82?
13    A.  I don't.  Sometime in June of '82.
14    Q.  How long did you work for that, from that time
15 period before you were laid off by General Motors?
16    A.  Up until October '82.  That's four months.  A
17 little over four months.
18    Q.  So it is your testimony that you recall working
19 at General Motors continuously from June of '82 to
20 October of '82?
21    A.  That's correct.
22    Q.  Did you work any other time periods at General
23 Motors?
24    A.  Prior to that time it was August the 31st to

Page 22

1 September the --
2     Q.  Sir, again, I'm not asking you what Mr. Bull's
3 affidavit says.  I have to ask you what you recall.
4     A.  But, sir, you asked me a question way back then.
5 I don't have the -- I forgot way back then.  You
6 understand me, but I can remember it from my standpoint
7 it was '82.
8     Q.  Okay.
9     A.  But from --
10    Q.  If you don't recall working any other time
11 period, you have to say that.  You can't read into the
12 record someone else's affidavit.
13    A.  But these are the records from General Motors.
14    Q.  It doesn't matter, sir.  This is a deposition
15 based on your testimony.
16    A.  You asked me something back in '80, '82.  Can you
17 remember things way back in the seventies, eighties?
18    Q.  Sir, it is not up to me to debate you.
19    A.  I understand that.
20    Q.  I have to ask the question.
21          Do you recall working for General Motors any
22 other time period?
23    A.  Yes, prior to then.
24    Q.  And when was that time period?

Page 23

1     A.  It must have been -- wasn't that long.  It was a
2 short period.  Sometime in September.  And later part of
3 August to September, something like that.
4     Q.  And what year was that?
5     A.  I remember starting then in '82.
6     Q.  Okay.  Now, you worked those two time periods at
7 General Motors.
8          After you were discharged in October of
9 1982, what was the next job that you held?
10    A.  Well, I started working for East Coast Electrical
11 Company for a short period.
12    Q.  And we have already talked about that.  That was
13 about a one-year period?
14    A.  Right around '82, around that period.
15    Q.  And then why did you leave East Coast Electric?
16    A.  Just short.  They got short-handed and work got
17 slow.
18    Q.  What was the next employment you had after East
19 Coast Electric?
20    A.  I went on -- I went on disability.  I had
21 emotional disturbance, depression.
22    Q.  And in what year were you diagnosed with a
23 disability?
24    A.  It was in 1984, '85, somewhere around there.

Page 24

1     Q.  And when you say you went on disability, was that
2 through the union or was that through some employer?
3     A.  That was from -- after General Motors and other
4 employers that I had worked for previously, such as East
5 Coast, General Motors.  So I went on -- my doctor said I
6 was emotionally distressed, emotional problems.  And I
7 went on disability.
8     Q.  Were you receiving disability payments from
9 anyone?
10    A.  Yes, from Social Security.
11    Q.  And you received Social Security disability from
12 1984 until when?
13    A.  Up until -- I'm still on it.
14    Q.  How much do you receive from Social Security
15 disability every month?
16    A.  $1,162 a month.  And also, doctor also said that
17 I have impingement from working for General Motors,
18 Dr. Galinet and Dr. Eric Johnson.  They said because of
19 the work I used to do up there, grinding cars,
20 constantly, all the time, caused me to have impingements
21 from the x-rays, medical report.
22    Q.  Did you receive any disability because of that?
23    A.  Well, I'm in the process of talking to an
24 attorney about that, because I did go through the hearing

EX.   1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 25

1  for that case, and the attorney left out some prudent
2  information that she was supposed to disclose, which she
3  didn't do, and which I'm in the process of talking to an
4  attorney of disclosing that once we get the subpoenas to
5  do so.
6      Q.  Okay.  When was the hearing on the alleged
7  impingement?
8      A.  Oh, that was about -- I forget.  That was in --
9  sometime in the nineties.  Don't get me quote -- you
10  should have told me what you needed before I came in
11  according to Rule 30 of the deposition rules.  Then I
12  would have been prepared to bring that information in to
13  you as far as dates and all that.
14          But it was in the 1990s or up to 2000,
15  Industrial Accident Board.
16      Q.  So you had a hearing in front of the Industrial
17  Accident Board.  What was their finding or ruling?
18      A.  Well, their findings was basically what she had
19  said, and they ruled against me.  But like I said, it is
20  going to probably be reopened because she failed to
21  relinquish pertinent information which I can prove from
22  her deposition and the hearing notes, and the records
23  that we received, and I'm going to take that to the
24  attorney within the next two weeks from now.  I got an

Page 26

1  appointment coming up as far as my worker's comp for my
2  shoulders, cumulative detrimental type effect case.
3      Q.  You haven't worked at General Motors since that
4  period we discussed in 1982, correct?
5      A.  That's correct.
6      Q.  Have you worked anywhere since you worked at East
7  Coast Electrical?
8      A.  No, because of the situations that I'm under, the
9  doctor got me under.
10      Q.  So you haven't been gainfully employed from 1984
11  to the present, correct?
12      A.  No.  I tried to see if General Motors was hiring
13  sometime in 2005, in which I got information that they
14  were hiring, and I was trying to get a part-time job with
15  them, or at least look into it, and it was told to me
16  that they weren't hiring.
17          Okay.  Do you want me to continue?
18      Q.  Sure.
19      A.  Okay.  They weren't hiring, so I filed a
20  complaint in the Department of Labor, okay, and they did
21  an investigation and found that General Motors stated
22  that they didn't hire nobody, not until October of 1999.
23          And which then I got a copy from seniority
24  list which showed that they hired people prior to that

Page 27

1  date, and prior, after that date, which was '82, '81,
2  clear on up until '80 something, '87 or something, so
3  from the seniority list -- okay.  And that's one of the
4  reasons why I inquired.
5      Q.  So do you remember on what day you went to
6  General Motors in 2005?
7      A.  I called.  I didn't go.  I called.
8      Q.  So it is your testimony that was in what month in
9  2005?
10      A.  That was in April.  I got the date in here.  I
11  think it was April the 15th, 2005.
12      Q.  Let's make this easier.
13      A.  I'm saying you have to go back by the records.  I
14  can't remember every single date and everything like
15  that.
16      Q.  Sir, I'm trying to get your testimony, but
17  apparently you continue to go through certain documents
18  that you have brought here which --
19      A.  Well, this is -- okay.  Go ahead.  Go ahead.  You
20  expect me to know things and you don't even know
21  yourself.  You got to look at the documents yourself.
22  You know what I mean?  Let's be reasonable here.  These
23  are the situations I had filed for facts discovery at the
24  District Court.  And I can't remember every little

Page 28

1  recollection, dates and times and stuff.  That's
2  impossible.
3          So, therefore, I brought the records with me
4  to refresh my memory.  These are the records already
5  documented at the court of the District Court.
6      Q.  Sir, are you done?
7      A.  Yes.  I'm just saying, I can't remember every
8  recollection.  I'm going to give you a date, April the
9  15th, 2005, if it is not correct, that will mean that I
10  don't know.  I just forgot.  But the records should
11  reflect that from the Department of Labor, clearly show
12  when it was filed.
13      Q.  Are you done?
14      A.  Yes.
15      Q.  Okay.  I'm going to ask you to put those
16  documents away.  I'm asking you to testify from what you
17  know.  And to the extent that you don't recall, then you
18  have to say that on the record.  Do you understand?
19      A.  Okay.
20      Q.  So please close the documents.
21          I'm going to hand you what the court
22  reporter has already marked as Deposition Exhibit 2.
23      A.  Okay.
24      Q.  Please take a moment and look at that document

Wilcox and Fetzer, Ltd.        Registered Professional Reporters

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 29

1 and tell me if you recognize it.
2    A.  Okay.  I recognize it.
3    Q.  Please tell the Court what that document is.
4    A.  This is my complaint filed at the District Court.
5    Q.  If we look at the second page of this
6 document --
7    A.  Mm-hmm.
8    Q.  -- you allege under number 9 that "I tried to
9 apply for a job in March 2005."  Did I read that
10 correctly?
11    A.  That's correct.
12    Q.  So did you apply for a job in March 2005 and
13 April 2005, or was it March 2005?
14    A.  March of 2005 I tried to apply for a job.  They
15 told me they weren't accepting applications.
16    Q.  Sir, you have to answer my question, and then
17 I'll follow up and you can explain.
18    A.  Okay.
19    Q.  Did you complete a job application in March of
20 2005?
21    A.  No.  I tried to apply.  I applied and that
22 application -- I tried to apply, but I was told that they
23 weren't accepting applications.
24    Q.  Stop.  Let me try the question again.

Page 30

1         Did you complete a job application in March
2 of 2005?  Yes or no?
3    A.  No.
4    Q.  Okay.  Did you complete a job application at
5 General Motors in April of 2005?  Yes or no?
6    A.  It was March of 2005.
7    Q.  Okay.  Tell me what you recall about the
8 situation in March 2005.
9    A.  March of 2005, I called there, personnel, and ask
10 them were they doing any type of hiring.  And the lady
11 said, "No.  You all washed up."  Smart lady.  And they
12 said that they weren't accepting any applications.  And
13 then hung up my ear vividly.
14    Q.  Now, who did you talk to?
15    A.  Well, she didn't tell me her name.  I knew it was
16 somebody from that department.  It was a female.
17    Q.  What number did you call?
18    A.  Oh, I forget that number.  It was a number to
19 personnel at General Motors.
20    Q.  Where did you get the number from?
21    A.  Oh, I got it from the union hall.
22    Q.  So did you physically go to the union hall or did
23 you call the union hall?
24    A.  I called the union hall and they gave me the

Page 31

1 number to the resource center, personnel department.
2    Q.  Who did you talk to at the union hall?
3    A.  The secretary there.  They don't give you names
4 and everything up there.
5    Q.  So you spoke to an unnamed person at the union
6 hall who gave you a number at General Motors?
7    A.  She is there all the time.  She knows me because
8 I call there pretty often to talk to different ones of
9 getting numbers, shop committee and different persons up
10 there.
11    Q.  In March of 2005 you called General Motors?
12    A.  Yes.
13    Q.  And had you ever talked to the person that you
14 called to before?
15    A.  No.
16    Q.  Did you identify yourself?
17    A.  Yeah.  I said, "My name is Roland Anderson.  I'm
18 looking for employment.  And she says, "Oh" -- she must
19 have knew me.  "Oh, you all washed up."  That's what she
20 told me on the phone.
21    Q.  What did that mean?
22    A.  I don't know.  She is saying to me maybe I'm of
23 age, because, you know, they take a lot of young people
24 up there.  And she said, "You all washed up" and hung up

Page 32

1 my ear.  They knows who I was.
2    Q.  How do you know they knew who you were?
3    A.  Because I tried before, trying to get documents
4 from my records, medical records, previous cases that I
5 have for workmen's comp.
6         They said I wasn't allowed on the property.
7 The security guard came out there and had to escort me
8 off the property said I wasn't allowed to be on the
9 property.  I said, "Sir, I'm entitled to my records."
10         "Well, we got a call from somewhere, from
11 personnel saying you are not allowed to be on the
12 property."  So they escorted me off the property.  Was a
13 black guard.
14         So that's why I couldn't get my records.
15    Q.  But you don't know who the person was that you
16 spoke to at General Motors?  You just knew she was in
17 personnel?
18    A.  She was in personnel, and it was a lady.
19    Q.  Okay.  Do you know if she was a secretary or --
20    A.  Evidently she must have been a secretary.
21    Q.  Okay.  You allege that you asked for an
22 application and she said -- did you ask for an
23 application or did you ask if they were hiring?
24    A.  Well, back then I think I asked them were they

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 33
1  hiring and could I get an application. They said they
2  weren't accepting no applications and they weren't
3  hiring. And then she said, "You all washed up." She
4  hung the phone, slammed -- actually slammed the phone on
5  my ear like that (indicating).
6      Q.  And you alleged that someone told you that
7  General Motors was hiring. Who was that person?
8      A.  Oh, it was somebody from -- that's some people I
9  knew on the corners that you walk by people that works at
10 General Motors, and they told me, "Oh, they accepting
11 applications" and this and that. I said, "Really?"
12         You don't have to know somebody just to talk
13 to somebody. And they was telling me at the liquor
14 store, and they was saying that some of their friends got
15 hired.
16         As a matter of fact, I got a sheet here,
17 Johnson, Lavinsky, his name is in here, and a few others.
18     Q.  We will go through that sheet in a minute.
19         What I want to know is: Who told you
20 General Motors was hiring?
21     A.  I can't recollect. It was just General Motors
22 coming working, going and getting their little --
23 whatever they getting, beer or whatever and, you know,
24 talking to people like I'm talking now. Didn't get no

Page 34
1  names or anything. They just told me that they heard --
2  I asked them were they hiring they said from their
3  recollection they were hiring. So that was it. That was
4  the end of the conversation.
5      Q.  Did any of those people work in personnel?
6      A.  No, I don't think -- they worked on the line.
7  They had uniforms and everything on. A bunch of them
8  come off from lunch break.
9      Q.  So on lunch break you see these people are going
10 to the liquor store and buying beer and alcohol?
11     A.  They do it or go to get a sandwich, you know,
12 stuff like that.
13     Q.  You don't remember the names of any of these
14 individuals?
15     A.  Well, no, because they was like people that --
16 they were just communicating, conversating. That's all
17 that was.
18     Q.  Okay. Then you say you were not given an
19 application and was told the plant was not hiring. On or
20 about April 15th, 2005 I learned from individuals that
21 Respondent was hiring.
22     A.  Mm-hmm.
23     Q.  Who is it that told you in April 2005 that
24 General Motors was hiring?

Page 35
1      A.  I told you, just people that you commonly meet.
2  You don't have to know their names. They was saying they
3  were hiring. I asked them were they hiring, just out of
4  curiosity. I want to know if they were hiring.
5         I seen them coming in there, a bunch of them
6  coming. I seen all these people. I said, "General
7  Motors is hiring again?" And they said, "Yes. Friends
8  got hired."
9         I don't know. I just took it from that
10 point, there it is, where it is, what it is. I asked
11 them some questions, like everyday people. Ask people
12 questions, especially if you see like five of them coming
13 into the stores and going different places. And I asked
14 them were they hiring they said, yeah, they were hiring
15 at that time, around that time.
16     Q.  Okay. And again, none of those people worked in
17 human resources, correct?
18     A.  No, they didn't work in human resources.
19     Q.  Your next sentence says, "Also because of my age
20 52, to believe the defendant listed me as terminated
21 (actually I was laid off). It also has, had retaliatory
22 effect on my being denied benefits to which I'm
23 entitled."
24         What does that mean?

Page 36
1      A.  Okay. Now, when I belonged to the union at that
2  particular time, in '82, now, certain benefits that a
3  person is entitled to, such as a right to recall, a right
4  to receive C sub and E sub benefits, if you are laid off
5  prior to October the 1st, 1990, which I have the Delaware
6  insurance commissioner is looking into that with
7  Fidelity, because I was supposed to have got those
8  benefits. But when they listed me as terminated or
9  temporary employee, retaliated against me, all those
10 benefits I was supposed to have got, pushed off the
11 table, wiped off.
12         I was entitled under the collective
13 bargaining agreement, because I worked at my 90 days,
14 requested for that period of time, that when they
15 retaliated, I lost all that. I couldn't get all of that.
16     Q.  Okay.
17     A.  And plus -- plus the right to be recalled.
18         See? I have rights. Like union benefits
19 rights, when they did that, retaliated that, that
20 destroyed all them rights, benefits.
21         Right now I'm fighting now with the
22 federal -- I mean federal -- Fidelity situation now
23 because the C sub and E sub that I was entitled to
24 benefits. When you belong to a union, you get benefits.

9 (Pages 33 to 36)

EX. 1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 37

1   And if you was a temporary or you got fired or
2   terminated, you don't get none of that.
3       Q.  Okay.  Sir, are you done?
4       A.  Yes.
5       Q.  So all of this last part that I read, "Also
6   because of my age, to believe the defendant listed me as
7   terminated," and this retaliatory stuff deals with your
8   layoff back in 1982?
9       A.  That's correct.
10      Q.  And all those documents that you allege should
11  have said one thing, should have said "layoff" but said
12  "terminated" were created back in 1982?
13      A.  Well, let me get this straight.  I know where you
14  are coming from with that.
15          I'm going to say this to you.  I have good
16  documents, document here.  This is a retaliation
17  situation.  I didn't know anything about it until the
18  April the 15th investigation from the EEOC, this pops up.
19      Q.  Sir --
20      A.  Otherwise, I would have done something about that
21  a long time ago.
22      Q.  April 15th of what year?
23      A.  April 15th of 2005.
24      Q.  Now, sir, you realize you are under oath,

Page 38

1   correct?
2       A.  Yes, April the 15th, 2005.
3       Q.  Sir, is it your testimony that these documents
4   were changed or --
5       A.  Altered, yes.
6       Q.  In fact, you were given copies of these documents
7   when you filed prior lawsuits, weren't you?
8       A.  No.  The -- you asked me the question.
9   I'm going to answer your question, sir.  That's the
10  way -- I know where you are coming from.
11          But I'm going to tell you, and you are
12  putting it the same way, category with them, these
13  documents, when I prior filed these suits, there is
14  affidavits sent to Judge Farnan from Dave Bull clearly
15  under the circumstances states that I was an hour worker.
16  You understand me?
17          So, therefore, none of this stuff was in
18  there until April the 15th, after the EEOC did their
19  investigation, and they found that I was listed as
20  terminated, I was listed as they turn around and said I
21  was a temporary employee.
22      Q.  Sir --
23      A.  I'm just saying --
24      Q.  Let's stop for a minute because I don't want you

Page 39

1   to commit perjury.
2       A.  I'm not perjury.
3       Q.  You understand that you filed prior lawsuits,
4   correct?
5       A.  That's correct.
6       Q.  You understand that you have lost every one of
7   those lawsuits, right?
8       A.  Because of the time frame, sir.
9       Q.  Yes or no?
10      A.  Yes, because of the time frame.
11      Q.  You also appealed these decisions through the
12  union, correct?
13      A.  Yeah.
14      Q.  And you understand that there are written
15  decisions from not only the local union, but the National
16  Union and the NLRB?  You understand that, correct?
17      A.  Yes, but that --
18      Q.  Yes, sir.  Do you understand that?
19      A.  Yes, I do understand that.
20      Q.  Do you understand because you commented on the
21  record in those cases about the very documents that you
22  are speaking, so is it your testimony under oath to this
23  Court that the first time you saw those documents was
24  April the 15th, 2005?  Yes or no?

Page 40

1       A.  Listen to me.  Let me explain.  I'm going to say
2   the first time I've seen the documents that they said I
3   was terminated and laid off was around -- after the
4   investigation from EEOC.
5           Prior cases that you are referring to is
6   stated from Dave Bull that I was an hourly worker.  I was
7   laid off.  That's what I'm trying to tell you.
8           And the reason why they said that those
9   cases were lost because it was time frame.  But the
10  information that you sent to them also reveals that your
11  situation, your staff, your members committed perjury
12  because the information that you sent them is incorrect
13  from the information that Dave Bull and the records
14  reflect that I was an hourly worker.  Okay?
15      Q.  Sir, what does it mean to be an hourly worker?
16      A.  Hourly worker means that you get the full
17  benefits of regular worker, hourly worker.  Temporary
18  workers don't get the benefits.  That's as simple as
19  that.
20      Q.  That's your definition?
21      A.  No.  That's the records from the union.
22      Q.  Sir, I'm trying to ask a simple question, and
23  apparently we are going to go a different direction.  I
24  want to make sure that this record is clear.  You have a

10 (Pages 37 to 40)

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 41

1  packet of documents that you brought here today, correct?
2      A.  That's correct.
3      Q.  I would like you to go into that packet and pull
4  out the documents that you say you didn't see until
5  April 15th of 2005.
6      A.  Okay.  Okay.  First --
7      Q.  Sir, please pull out the records you say you
8  didn't see until 2005.
9      A.  Okay.  Cool.  Here it is right here.  September
10  2005 -- can I read something for the record, please?
11      Q.  She has to mark this and it is going to become an
12  exhibit.
13      A.  Right.  Thank you.
14      Q.  She will give you back a copy before you leave.
15      A.  Thank you.
16      Q.  Are there any other documents in here you allege
17  that you didn't know about until April of 2005?
18      A.  April -- September 8th, 2005.  That's what was
19  investigated and that's what prevailed, the retaliation.
20  That's when the retaliation came into effect, that
21  information right there.
22          First of all, let me say something to you,
23  sir.  The one I was referring to you from Dave Bull
24  clearly states from -- to the records, which is going to

Page 42

1  be marked Exhibit B if you want, will clearly show that
2  Mr. Dave Bull said -- never said that, that I was a
3  temporary worker.  Never said I was terminated.  His
4  information was sent to Judge Farnan, which is in here.
5  Mark it as Exhibit B.
6          MR. WILLIAMS:  Can you take out some exhibit
7  stickers, please?
8      A.  This is way back when I first filed the
9  discrimination suit against General Motors.  The records
10  from General Motors shows that the plaintiff was employed
11  as an hourly worker.  Okay.  Didn't say layoff or
12  anything.
13          From August 31st to September 21st, 1981
14  when he was laid off is during that period of time he
15  acquired no seniority rights because he was not employed
16  for 90 days as required under the terms of the collective
17  bargaining agreement.
18          Plaintiff was rehired on June the 25th, '82
19  and was again laid off in October of '82.  Under the
20  agreement, he acquired senior seniority rights including
21  the right to recall.  Okay.
22          Now, nowhere on here it says that
23  Mr. Anderson was terminated or laid off.
24      Q.  Okay, sir.

Page 43

1      A.  Wait a minute now.
2      Q.  No.  Hold on.  You have now gone through two
3  different documents.  Now we have to clean the record up.
4          MR. WILLIAMS:  Can you please mark this as
5  Deposition Exhibit 4?  For the Court's edification, we
6  are marking a letter from September 8th, 2005 from the
7  U.S. EEOC Philadelphia office as Deposition Exhibit 4,
8  which is what Mr. Anderson alleges was new information
9  that told him that there was a retaliation charge.
10          (Anderson Deposition Exhibit 4 was marked
11  for identification.)
12  BY MR. WILLIAMS:
13      Q.  Okay.  Sir, I'm going to ask you to turn back to
14  Deposition Exhibit 1.
15      A.  Okay.  Are we going to mark this exhibit?
16      Q.  No.  We don't need to.
17      A.  I would like to.
18      Q.  Sir, if you just wait a minute and go back to
19  Deposition Exhibit 1 --
20      A.  Okay.
21      Q.  It is that document.
22      A.  All right.
23      Q.  This is your complaint, correct?
24      A.  That's my complaint.

Page 44

1      Q.  If we go to the last two pages -- I'm sorry --
2  the last four pages of your complaint, please flip to the
3  back of the complaint that's been marked as Exhibit 1.
4      A.  Okay.
5      Q.  Keep going.
6      A.  I've got this right here.  I already have this in
7  front of me.
8      Q.  You have to go to the exhibit.
9          In Deposition Exhibit 1, does that appear to
10  be the affidavit of David Bull?
11      A.  Yes, sir.
12      Q.  And that's the affidavit that you were just
13  reading from?
14      A.  Correct.
15      Q.  That affidavit is dated the 16th day of
16  September, 1992.
17      A.  Okay.
18      Q.  Is that correct?
19      A.  That's correct.
20      Q.  And it is in lawsuit Roland Anderson vs. General
21  Motors, Case Number 92335; is that correct?
22      A.  That's correct.
23      Q.  So this was an affidavit that was in your 1992
24  lawsuit, correct?

11 (Pages 41 to 44)

EX. 1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 45

1    A.   That's correct.
2    Q.   And you read certain parts of that?  You read
3  part 2 that we see at the bottom, correct?
4    A.   That's correct.
5    Q.   And you read the first portions of that paragraph
6  on the next page, correct?
7    A.   That's correct.
8    Q.   I'm going to read the remainder of that sentence,
9  just so the Court record is clear, because apparently it
10 says, quote, Under the agreement, he acquired certain
11 seniority rights including a right to be recalled to
12 employment, but these rights expired on a time for time
13 basis.  Having been employed for only four months,
14 plaintiff's right to be recalled, as well as any other
15 seniority rights, expired four months after he was laid
16 off.  That is by February 1983."  That's the end of
17 paragraph 2.
18        Did I read that accurately, sir?
19   A.   Yes.
20   Q.   Was that the rest of the paragraph that you did
21 not read into the record?
22   A.   No.  Well, you didn't give me a chance.  I can
23 read that.  That doesn't mean anything.  It only reflects
24 that I was laid off.  I wasn't terminated or temporary.

Page 46

1  I was laid off.  And that's what it says up top there.
2  "Plaintiff was rehired June the 25th."
3        These are my allegations, this is the order
4  from the judge for allegation.  "Plaintiff was rehired on
5  June 25th, 1982 and was again laid off."  I wasn't
6  terminated or temporary.
7    Q.   Okay, sir.
8    A.   That's all I wanted to clear, sir.
9    Q.   And that's an affidavit from 1982, correct?
10   A.   This affidavit says 1992.
11   Q.   I'm sorry.  From 1992.
12   A.   Let's get that correct.  '92.
13   Q.   That was part of a prior lawsuit?
14   A.   Yes.
15   Q.   And you lost that lawsuit?
16   A.   Well, because, again --
17   Q.   Yes or no, sir?
18   A.   Yes, because of the fact that it was untimely.
19 That's what the judge says.
20   Q.   If it was untimely in 1992, what makes you think
21 it is timely in 2000 and --
22   A.   This is not the same lawsuit, sir.  This is
23 retaliation.  Besides that, the false information that's
24 going to the judge, that's going to be investigated.

Page 47

1  There was false information rendered to the judge during
2  that prior time and according to the Third Circuit Court.
3    Q.   Who is investigating that?
4    A.   A person can reopen.  I got documentation.  It is
5  going to be reiterated because of the information was
6  sent to them was false, false situation.
7        Now, temporary and terminated don't mean
8  layoff.  Okay.  Temporary and terminated doesn't mean
9  hourly worker.  All right.
10   Q.   Under whose definition, sir?
11   A.   Under the rules of collective bargaining
12 agreement rules.
13   Q.   What rule are you referring to?
14   A.   If you go down here to paragraph 4 on that
15 exhibit, it says here former employee still have
16 seniority rights, do not have a right to be called as
17 temporary employees.  That's the reason why I was
18 rehired.  Temporary employees don't get rehired.  Okay.
19 I was rehired.
20   Q.   Sir, please read the sentence accurately.
21   A.   Read it.  It says, "Former employees who still
22 have seniority rights do not have a right to recall to
23 temporary employment."  Again, I was --
24   Q.   Show me, tell me what paragraph number you are

Page 48

1  reading.
2    A.   Paragraph here, down here by December the 27th,
3  1991.  Do you see that?
4    Q.   Yes.
5    A.   Former employees who still have seniority rights
6  do not have a right to be called to temporary employment.
7    Q.   That says temporary summer --
8    A.   Summer employment, right, temporary summer
9  employment.
10   Q.   Did you ever apply for temporary summer
11 employment?
12   A.   No.  No.  Listen to me.  No, I didn't.  What it
13 was, I was recalled back, remember.  I started back in
14 August, page 1, exhibit -- August the 31st to September
15 the 21st, 1981, he was again laid off.  Remember,
16 temporary employees don't get recalled back.  Okay.
17 Hourly employee, I was recalled back.  Plaintiff was
18 rehired back June 25th, '82, was again laid off in
19 October of '82.
20       So, therefore I wasn't a temporary employee.
21 So there it is.
22   Q.   So under your theory, you have pieced together
23 the fact that because you were laid off and then brought
24 back, and then laid off again, you were not a temporary

12 (Pages 45 to 48)

EX.   1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 49

1  employee?
2      A.  It is not a theory, sir.  This is the collective
3  bargaining agreement.
4      Q.  Sir, were you ever listed on the seniority list?
5      A.  Sir --
6      Q.  Yes or no?
7      A.  Seniority list.  They didn't do that right,
8  either.  They was supposed to list me on there as
9  seniority list.  Okay.  That's another episode.  I have
10  documentations here, show I wasn't put on the seniority
11  list.  What is up with that?
12          The union says as long as you got the 90
13  days in, I got the union agreement here, collective
14  bargaining agreement, I can read it to you.  Since you
15  don't have that, I can read that to you.  It says as long
16  as you require 30 days -- I can read it to you and
17  paragraph Section 4(a), Section 4(c) and the collective
18  bargaining agreement.
19          If it is all right with you, I like to enter
20  that as an exhibit, too.
21          See?  My rights were violated.  I wasn't a
22  layoff.  I wasn't temporary.  I was an hourly worker.
23      Q.  And all of this happened back in 1992?
24      A.  This -- this is when I filed the lawsuit.

Page 50

1      Q.  I mean 1982.
2      A.  '82 when all this transpired, when I was supposed
3  to have been a union worker, they was supposed to call me
4  back.  The union didn't do their job.  The management
5  didn't place my name on the seniority list.  And I was an
6  hourly worker.  I worked my 90 days.  I didn't -- I
7  wasn't trying to cause no problems to people.
8      Q.  Do you remember the plant being shut down during
9  that time period?
10      A.  It was shut down after I worked the '90 days.  I
11  have all the information there.  If you finish reading
12  this, I will tell you.  I'm saying read it for yourself.
13  It says, "General Motors has" -- do you want me to read
14  it?
15      Q.  I don't want you to read it.
16      A.  Two weeks.  Laid off for two weeks.  Shut down
17  for two weeks.  By no time before then I have my 90 days
18  in.  I worked four months.
19          I'm just reading Exhibit B, whatever you
20  want to call it.
21      Q.  Okay.  So you are taking issue with how your time
22  was calculated back in 1982?
23      A.  I'm taking issue.  No, I'm not, sir.  I know
24  where you are coming from.  Listen.  The purpose we are

Page 51

1  here, you can -- like Judge Farnan says, the allegations
2  was set for retaliation.  Okay.
3          Now, this didn't pop up until -- it is
4  September the 8th, 2005.  So I was entitled to certain
5  things.  And here, I was entitled to recall, and
6  according to the seniority list, I was never called back.
7  Never even put on the seniority list.  I had 90 days.
8          I'm not trying to throw it in front of these
9  people.  Man, I'm telling you racial situation and that's
10  what we are dealing with here, under the surface.  And
11  now this pops up.  Terminated.  Temporary employee.  I
12  was never a temporary employee.  I worked my 90 days.  I
13  know what I did.  I worked my 90 days.
14          Mr. Dave Bull, he is going to be a witness
15  to the fact if we go to trial on this.  This is a fact.
16  I ain't got no reason to lie about that.  I ain't have no
17  reason to lie.  They got me listed as temporary.
18  Temporary doesn't get recalled back according to the
19  records here.  Former employees who still have seniority
20  rights do not have any recall rights to temporary summer
21  employment.
22          Now, if I was a temporary employee, I would
23  never have got called back, sir.
24      Q.  Sir, when were you recalled for temporary summer

Page 52

1  work?
2      A.  I wasn't no temporary summer worker.  I just told
3  you.
4      Q.  Exactly.  That says they don't have to be
5  recalled for temporary summer work.
6      A.  Temporary summer work, that means temporary
7  people.  If you were hire as a temporary, temp, I have a
8  union contract, you don't have certain rights as hourly
9  employees.  Hourly employees are different than temporary
10  employees.  Known fact.
11      Q.  Got it.  I'm sorry.  I will try to make sure we
12  don't talk over each other.
13      A.  Because I like to bring in Exhibit C from --
14      Q.  Sir, you have to wait until I'm done asking
15  questions if you have something you need to add, then she
16  will be more than happy to mark whatever exhibit you want
17  and let you talk on for 45 minutes if you like.
18          But right now you have to answer the
19  questions that I'm asking.
20      A.  No problem.  I am.  I'm answering fully of my
21  situation.
22          I'm not temporary.  I was an hourly worker
23  and rehired back.
24      Q.  Okay.  So to clarify the record, after all of

13 (Pages 49 to 52)

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 53

1  this, you called in March of 2005, but you don't know who
2  you spoke to?
3      A.  I spoke to some lady on the phone, and I asked
4  her were they hiring --
5      Q.  Okay.
6      A.  -- again and they said to me that you are all
7  washed up.
8      Q.  Okay.  Sir --
9      A.  We are not accepting applications.  And then,
10  boom, that's the truth.
11      Q.  Sir, do you know the names of anybody that was
12  hired in March of 2005?
13      A.  Sir, like I said, that --
14      Q.  It is a yes-or-no question.
15      A.  No, because like I said, it was just people that
16  worked at General Motors.  I don't know everybody -- I
17  don't know too many people working up General Motors.
18      Q.  As you sit here today, you cannot provide the
19  Court with the name of any individual that was hired in
20  March of 2005?
21      A.  No, just people there just walk by working at
22  General Motors, they said, "Yeah, they hiring."  It was a
23  bunch of them.
24      Q.  Okay.  Sir, as you sit here today, can you

Page 54

1  provide the name of any individual that was hired in
2  April of 2005?
3      A.  I can put -- I can do -- look at the list, show
4  you the names of people that were hired from '81 clear
5  up.
6          I have a seniority list here to show you
7  that, that reflects that, what you are referring to.
8      Q.  Sir, we are limited to the allegations in your
9  complaint.
10      A.  Right.
11      Q.  I want to know if you can name any employee or
12  any person that was hired by General Motors as you sit
13  here today in March of 2005 or April of 2005.
14      A.  Sir, it was some people from General Motors
15  saying they were hiring.  That's all I'm saying to you.
16          And that's when I did my investigation, and
17  that case, there is not the case that is on, situation
18  for allegations of retaliation from the Department of
19  Labor.
20          Now, I have a copy of their investigation,
21  clearly shows that it was retaliation from the Department
22  of Labor.  I can present that.
23      Q.  Sir, let's look at what you wanted to bring to
24  the Court's attention, which is Deposition Exhibit 4.

Page 55

1      A.  Yeah, of the termination, temporary employment.
2  That's what we are here for, retaliation.
3      Q.  Sir, can you please look at Deposition
4  Exhibit 4?
5      A.  Right.
6      Q.  Now, you've pointed out that there is a sentence
7  in here that says in addition to these allegations, you
8  believe you were denied benefits that you were entitled
9  to because respondent listed you as terminated and not
10  laid off after working for respondent previously.  Do you
11  see that?
12      A.  What paragraph are you reading from, sir?
13      Q.  The last sentence of the first paragraph.
14      A.  What it says, in addition to these allegations,
15  you believe you were denied benefits that you were
16  entitled to because respondent listed you as terminated
17  and not laid off after working for respondent previously,
18  yes.
19      Q.  The next paragraph says the respondent agrees
20  that you were an employee during the following periods:
21  August 31, '81 to September 21, 1981, and again from
22  June 25th, 1982 to October 1, 1982.
23          According to the collective bargaining
24  agreement, you did not reach the status as an employee,

Page 56

1  but remained listed as a temporary employee because,
2  quote, employee shall be regarded as temporary employees
3  until their names have been placed on the seniority list,
4  period, closed quote.
5          Further, comma, quote, Employees may acquire
6  seniority by working 90 days during a period of six
7  continuous months in which event the employee's seniority
8  will date back 90 days from the date the seniority is
9  acquired, period, close quote.
10          Do you see that?
11      A.  Yes.
12      Q.  Did I read that accurately?
13      A.  You read it accurately, but --
14      Q.  Okay.  Thank you.
15      A.  Can I --
16      Q.  No.  The next paragraph says since you did not
17  work within a period of six continuous months, you did
18  not qualify as an employee with seniority, but listed as
19  a temporary employee.  Therefore, you do not have access
20  to any accumulated benefits.
21          Did I read that accurately?
22      A.  Well, that's --
23      Q.  Yes or no?  Did I read that accurately?
24      A.  Yes, you did.  Yes, you did.

14 (Pages 53 to 56)

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 57

1    Q.   The next paragraph regarding your hiring issue,
2    "Respondent states that no workers have been hired at
3    that site since October 1999 indicating that there were
4    no job opportunities at the time of your inquiry in March
5    2005."
6        Did I read that accurately?
7    A.   What they're stating, yes, yes.
8    Q.   Thank you.
9        The next paragraph says:  "This is to inform
10   you that it will be recommended that the EEOC dismiss the
11   charge.  If the charge is dismissed, the commission will
12   issue a decision stating that it is unable to conclude
13   that the information obtained establishes a violation of
14   the statute.  The decision would not certify the
15   respondent is in compliance with the statute.  The
16   dismissal and right to sue will be sent to you to allow
17   you to file a private suit if you want to pursue that
18   matter further."
19       Did I read that correctly?
20   A.   That's correct.  Now, can I make my comments on
21   that?  This is where the false information comes in at.
22   Okay.  I have documentations here from the union,
23   collective bargaining agreement.  Okay.  It requires you
24   to work 90 days, within the period of six months, okay,

Page 58

1    and then it says here, article -- can I get my union
2    book, if you don't mind?
3    Q.   You can do it when it is your turn to testify.
4    Right now you are here to answer my questions.
5    A.   All right.
6        So, again, according to Exhibit 4, the
7    records reflect from General Motors plaintiff was hired
8    as hourly worker, not a temporary worker.  Again, then
9    he -- from workers from August the 31st to September the
10   21st.  I was hired as an hourly worker, not a temporary
11   worker.  Temporary, this is what they mean by temporary.
12   When you are hired as temporary, this is what you said
13   that's temporary.  Hourly worker back in '82.
14       Now, this is dated September 2005 --
15   Q.   Why does that matter?  I'm confused.
16   A.   Well, it matters because of the fact of the
17   matter is that this here succeeds this.  This is way back
18   in '82.  The records reflect that General Motors show
19   plaintiff was employed as an hourly worker from August
20   the 31st to September the 21st, 1981 when he was laid off
21   during the period of time he acquired no seniority
22   rights.  Didn't say anything about temporary.  Okay.
23       Remember, I'm hourly worker.  They would
24   have mentioned temporary.  This is to their judge.

Page 59

1        Okay.  Then employed for 90 days as required
2    under the old collective terms of the bargaining
3    agreement.  I required 90 days.  Okay.  During that
4    period of time, plaintiff was rehired June the 25th,
5    1982, and again was laid off, October 1982.
6        Under certain agreement acquired senior
7    seniority rights.
8    A.   I belonged to the union.  I wasn't a temporary.
9    Temporary is temporary.  That's where they get that and
10   tricked everybody.  This is the facts and I have the
11   collective bargaining agreement here, sir.
12       This is what we are going to open up.  We
13   coming back.  Oh, yes.  Because you gave false
14   information to these people and I have documentation to
15   show that from the union contract, it is totally
16   different.
17       And this --
18   Q.   Sir?
19   A.   Wait a minute.  Let me finish.  I gave you a
20   chance to finish.  Let me finish.
21       This copy here was sworn dated from David
22   Bull from EEOC rep, representing General Motors, sworn
23   and subscribed before me the day and year first above
24   witnessed.

Page 60

1        So what you did, you all commit perjury.
2    You the one gave false information.  And this will be
3    attended to by the Attorney General.  I have a meeting
4    with them sometime this week.
5        And according to General Motors' benefit
6    center, it says here hourly rate employees pension plan.
7    I was an hourly worker.  I was never a temporary.  You
8    want to see that?  This is from General Motors' benefit
9    service center.  I wasn't a temporary.  Temporaries don't
10   get anything, like you just read.
11   Q.   Sir, how many lawsuits have you had against
12   General Motors over this issue?
13   A.   Sir, I had five of them.
14       And I'm saying to you, it was incorrect
15   informationally this problem came in.  Temporary and
16   terminated.  Never was -- never -- you can look through
17   the records.  Never once was this ever mentioned.  Okay.
18   This is the reason why -- this is all going to go back,
19   because of the false information that was rendered.
20       And under certain Third Circuit Court rules,
21   when somebody misleads the Court, the statute of
22   limitations becomes towed.  I can read that case law to
23   you, too, because I have that in the documents.
24       Now, that was all false information that was

15 (Pages 57 to 60)

Wilcox and Fetzer, Ltd.          Registered Professional Reporters          302-655-0477

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

---

Page 61

1   given to the Equal Opportunity Commission, the Department
2   of Labor, the District Court. All had information was
3   falsely given.
4          According to the records, Dave Bull has
5   here, I was an hourly worker. And like I said
6   previously, former employees who still have seniority
7   rights do not have a right to be called to temporary
8   summer employment. So I wasn't temporary. I was an
9   hourly worker. I was recalled back June the 25th, and
10  again laid off in October '82. So temporaries don't even
11  get a call back.
12         I'm keeping this document what you just read
13  as evidence. This is exhibit -- September the 8th.
14         Now, the other section is, you said that
15  they didn't hire nobody here, October 1999. To recall
16  the hiring issue, respondent states that no workers have
17  been hired at that site since 1989.
18         That's another false information you,
19  General Motors, gave to everyone, including the courts,
20  including the DOL, Equal Opportunity Commission.
21         I show you when they start hiring. I got
22  this from a union member, seniority list. It goes way up
23  here when they stop hiring -- start hiring 12/20/81.
24         So you are saying they didn't hire nobody

---

Page 62

1   since 1999. That's a lie. It says here all these people
2   here, '82 to '89, and I was never put on the seniority
3   list. Riley or Livingston or Johnson.
4       Q.   When was that seniority list created?
5       A.   This seniority list was created 1907.
6       Q.   I'm sorry.
7       A.   Wait a minute. I'm sorry.
8            It says here -- this is from report from
9   General Motors seniority list. That's what it says on
10  there, unit ID 1907. This must have been reported some
11  time. I don't know when it was reported, but this is
12  seniority list I received from the union. These guys
13  started here 12/28/81, and you said they didn't hire
14  nobody since October 1999. They hired people from '81,
15  '82, '83 on.
16         Mark that as exhibit too, please.
17     Q.   Considering it is already --
18     A.   I like to make one more statement, that the
19  Department of Labor Privacy Act statement, they got their
20  own investigation. Of course, as you know, that you have
21  to go through the EEOC, Department of Labor, and they
22  were totally unaware of this, too, because all of suits I
23  done brought, they never mentioned I was terminated or
24  laid off. Okay.

---

Page 63

1          It says here:  "Please be advised that the
2   information" -- "Please be advised that the information
3   that you have provided comes under the provision of the
4   Privacy Act of 1974, Public Law 93-579.
5          "The authority for requesting the personal
6   information contained herein are provided in 42 USC,
7   2000e(9), 29 USC 201, 29 USC 621, and 19 Delaware Code,
8   712(c).
9          "The principal purpose of obtaining this
10  information is to complete the charge of discrimination
11  which will be verified by the charging party and served
12  upon the respondent. In some instances, witnesses' sworn
13  statements may become relevant to determining the charge
14  of discrimination.
15         "These forms are used to initiate and
16  investigate the charge of discrimination under the laws
17  and to impeach or subsustained a witness's testimony."
18         Okay. And the section they are referring to
19  is retaliation. Remember, this is their own
20  investigation from all the charges or complaints or suits
21  that was filed by me, and never once it was mentioned
22  terminated or temporary, including Dave Bull's letter to
23  Judge Farnan clearly states that he was an hourly worker.
24  Doesn't say anything about temporary or terminated.

---

Page 64

1   Okay.
2          Now, the investigation charge of
3   discrimination, this form is affected by the Privacy Act
4   of 1974. Okay?
5          Now, it says here the charge is applicable
6   dealing with retaliation. "Brief statements of
7   allegation, charging party alleges that are retaliated
8   against him because of negative statements made regarding
9   his job status during an EEOC investigation."
10         And by the way, I have a complaint with the
11  department of disciplinary counsel about these issues,
12  false information. Possibly somebody is going to get
13  disbarred because of these reasons. Okay. I have a copy
14  of a complaint with them. You can check with them.
15  There is a complaint because of the false allegations was
16  sent. Corrupt justice here.
17         Okay. "Consistently charging party claims
18  that respondent falsely stated that he was temporary
19  employee instead of a permanent employee, which has
20  affected his union benefits. Charging party claims that
21  he was laid off as an hourly worker, employee and
22  respondent hired white workers without contacting him
23  first. Thereafter charging party filed a racial
24  discrimination charge which resulted in false information

---

16 (Pages 61 to 64)

# EX.   1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 65

1 given to the EEOC about his job status as a temporary
2 worker."
3        It says here:  "Unanimously charging party
4 claims that this is further evidence that respondent's
5 information is a form of retaliation because it affected
6 his current benefit status.  Respondent explained
7 charging party claims that respondent has not given a
8 reason explaining for placing him as a temporary worker
9 after investigation while he previously worked as an
10 hourly worker under a previous agreement."  Okay?
11        "Applicable law(s):  Title VII of the
12 Delaware" -- "of the Civil Rights Act of 1964, as
13 amended; Delaware Discrimination Employment Act.
14        "Comparator(s) or other specified reason(s)
15 for alleging discrimination:  Charging party claims that
16 respondent's information during an EEOC investigation has
17 revealed further adverse action in the form of
18 retaliation because the information has negatively
19 affected his union benefit status.  Charging party claims
20 that during a legal proceeding, Dave Boyle, respondent's
21 EEOC representative, gave an affidavit that charging
22 party was an hourly worker and under agreement acquired
23 certain seniority rights under the previous collective
24 bargaining agreement."  Not the one that they were saying

Page 66

1 way back in September 2008.
2        That's another false situation.  You are
3 talking about the previous.  Additional information and
4 verification of these facts are provided by attached
5 verification.  And that was the verification that we have
6 here.
7        (Discussion off the record.)
8        (Anderson Deposition Exhibits 5, 6, 7, 8, 9,
9 10 and 11 were was marked for identification.)
10 BY MR. WILLIAMS:
11    Q.   Okay.  Sir, we are going to try to get this
12 deposition back on track and I'm going to ask that you
13 have now marked all these exhibits, correct?
14    A.   That's correct.
15    Q.   Now, the allegations in the case that is listed
16 as 05-877 relate to a phone call made in March, correct?
17 Yes or no?
18    A.   Wait a minute.  Can I say something?
19    Q.   No.
20    A.   The case --
21    Q.   You've now had 20 minutes to read --
22    A.   I know what you are saying.  I want to state one
23 thing.
24        I've got a copy here from the courts, case

Page 67

1 number 06-669 for deposition.  I have a copy of that.
2 I'm going to mark that exhibit, as well.  Okay.  It
3 didn't reflect 05-877.
4    Q.   Sir, whatever you want to mark you have to mark
5 when I'm done.  I've now reached the point of being
6 frustrated with being stopped every five minutes because
7 you want to mark something.  You get to mark whatever you
8 want and say whatever you want after you answer my
9 questions.  Please focus on what has been marked as
10 Deposition Exhibit -- I'm so confused I don't even see it
11 anymore.
12    A.   You are trying to make me say yes to something
13 which I have documents show otherwise.  I can't say yes
14 to that.  You said that 05-877 --
15    Q.   Sir, please focus your attention on the complaint
16 that is dated --
17    A.   Now you talking about complaint.  You said
18 deposition at first.
19    Q.   I said complaint.
20    A.   You said deposition of 05-877.
21    Q.   Yes.
22    A.   This is complaint.
23    Q.   That's the allegations that -- please stop.
24 That's the complaint that we have been discussing,

Page 68

1 correct?
2    A.   Complaint, yes.  But you said "deposition."  I
3 just want to clarify things.  I don't want you to put
4 things in my mouth, sir, when I heard you said
5 deposition.  She can read it back.  That's all I'm just
6 saying.
7    Q.   Please focus on the complaint that has been
8 marked Deposition Exhibit 2.
9    A.   What -- what was the number of the case number
10 for deposition?
11    Q.   Just look at the deposition exhibit.  It says
12 Anderson 2.
13    A.   This is -- this is complaint.  This is not a
14 deposition.  Right here.  Anderson 2, complaint.  It says
15 on top, "Complaint."  See there?  Don't put words in my
16 mouth.  I'm being frank and straight up with you
17 truthful.
18    Q.   What we have here is a failure to communicate.
19 I'm going to try and say it very slowly.
20        Do you see the sticker at the bottom of the
21 document?
22    A.   Yes.
23    Q.   Does that say "Deposition Exhibit"?
24    A.   Well, it says there "Deposition."

17 (Pages 65 to 68)

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 69

1  Q.  That says "Deposition Exhibit Anderson 2,"
2  correct?
3  A.  That's correct.
4  Q.  I want you to focus your attention on the
5  document that has been marked for this deposition as
6  Deposition Exhibit 2.  Do you see that document?
7  A.  Okay, but that's not a deposition.  This here is
8  a complaint.
9  Q.  Sir, we refer to it by the exhibit number.  I
10  understand it is a complaint but --
11  A.  All right.  I'm just saying what I'm seeing.  You
12  are saying "deposition" and the thing says "Complaint,"
13  but it says down the bottom, "Deposition."
14       Okay.  I want to get clarified on that.  I'm
15  not going to say things that is not contrary to what is
16  on the complaint here.  I'm looking at and you saying
17  "Deposition."  This is the complaint.  It doesn't say
18  "Deposition."  It says "Complaint."  That's all I just
19  want to clarify that.  That's all.
20  Q.  Why don't we take a break?
21  A.  I'm saying we can go ahead.
22  Q.  Let's take a five-minute break.
23  A.  Evidently you saying "Complaint" and "Deposition"
24  is two different things.

Page 70

1       MR. WILLIAMS:  For the Court's edification
2  and to make sure we are on the same page, we have now
3  been at this for -- can you tell me?  Do you have the
4  time marked as what time we started?
5       THE COURT REPORTER:  9:15.
6       MR. WILLIAMS:  9:15.  It is now, by my
7  watch, 10:45.  We are still getting through the basic
8  allegations of this.
9       Sir, I'm going to make sure we explain this
10  on the record so that if I have to call the Court and say
11  you are needlessly wasting time and causing this to be an
12  undue expense, I want you to understand what I'm saying.
13       When you are in a deposition, this is the
14  court reporter.  The court reporter's job is to take down
15  everything that is said, and she keeps the official
16  record of what documents or exhibits are provided during
17  the deposition.  In that capacity, as the official court
18  reporter, she marks documents with an exhibit number so
19  that the Court can refer to it by that exhibit number.
20  A.  Okay.  You didn't tell me that first.  You didn't
21  explain that to me first.  Now I understand.
22  Q.  I'm going to explain it.
23       So when I ask you to refer to Deposition --
24  let's say Deposition Exhibit 4.  It doesn't matter what

Page 71

1  the title of the document is.  I'm referring to the
2  number that the court reporter has assigned it for
3  reference by the Court.
4       Are we on the same much page now?
5  A.  Now we are, correct.
6  Q.  So this document is Deposition Exhibit 2.  It is
7  not to confuse you.  It is not to prolong the deposition.
8  It is so we all have the same point of reference.
9       Do you understand that now?
10  A.  I understand that now.  You didn't explain it to
11  me at first.  Because I'm looking at the complaint and
12  you are saying "Deposition."
13  Q.  Thank you.
14  A.  You want me to refer to something and that's
15  untruthful.  I'm looking at a complaint.  Now you are
16  telling me Anderson Exhibit 2.  I understand that now and
17  make sure that's clarified with the court reporter.  I
18  understand.
19  Q.  We are going to take a five-minute break.
20  A.  You got to explain things to me and I didn't
21  understand what you are saying, sir.  It ain't my fault.
22  I think it is your fault.
23  Q.  That's fine.
24  A.  Now you explained it.

Page 72

1  Q.  I will say it is my fault and now we are all on
2  the same page.
3  A.  Thank you.
4  Q.  And we can go forward.
5       (Recess taken.)
6  BY MR. WILLIAMS:
7  Q.  Do you understand we are back on the record?
8  A.  That's correct.
9  Q.  And you also understand that you are still under
10  oath?
11  A.  Yes.
12  Q.  Focusing your attention on Deposition Exhibit 2,
13  which we were discussing earlier, we have discussed the
14  telephone call you allegedly made in March of 2005,
15  correct?
16  A.  That's correct.
17  Q.  We have also discussed the letter from
18  September 8th of 2005 which was marked as Deposition
19  Exhibit 4.
20  A.  Correct.
21  Q.  Do you have any phone records or any documents
22  that show you made the call to General Motors in March of
23  2005?
24  A.  No, because they do not record -- I'm not

18 (Pages 69 to 72)

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 73

1   supposed to record them without their permission and I
2   didn't get a chance. That's the only proof I would have
3   had. I didn't get a chance to do so because she hung up
4   so quickly.
5       Q.  Okay. Are there any other allegations that form
6   the basis of what has been marked as Deposition
7   Exhibit 2?
8       A.  Yes. The allegation stating that they hired
9   people -- they didn't hire nobody until October 1999,
10  which seniority list showed they hired clear on up so
11  many years from '81 on.
12      Q.  And that is related to what?
13      A.  That's related to the information that was sent
14  to Deposition Number 4, which she clearly states that
15  General Motors never hired anybody until October of 1999.
16      Q.  What document do you allege that shows that they
17  were hiring people?
18      A.  Okay. The document that I have here --
19      Q.  It is a marked exhibit, correct?
20      A.  Yes. Exhibit -- is that 1 or 11?  11.
21      Q.  And as we look at Exhibit 11, it says it appears
22  to be, for the Court's records, a unit. It is a
23  seniority list, without a date on it, but it appears to
24  show people with seniority from 1981 and 1982. And it is

Page 74

1   dated. I'm sorry. There is a date on the second page,
2   4/24/93.
3           Anything else with regard to the allegations
4   in Deposition Exhibit Number 2?
5       A.  Okay. I was never called back, either.
6   According to Dave Bull, which I was supposed to have been
7   called according to time for time, back in '82.
8   Okay. Now, that is on Exhibit --
9       Q.  Sir, that's part of Exhibit 1?
10      A.  Exhibit 1, okay.
11      Q.  And I think you also marked it as a separate
12  exhibit.
13      A.  Exhibit 1, okay. Exhibit 10 it says here.
14      Q.  Okay, sir. And that, in Exhibit 10, it says that
15  your time expired on a time-for-time basis, correct?
16      A.  Yeah, at that particular time, it expired for
17  time-for-time basis.
18      Q.  What does that mean to you when it says your
19  seniority expired on a time-for-time basis?
20      A.  On a time-for-time basis, that your time frame
21  had expired. Simple as that.
22      Q.  Meaning if you worked for four months at General
23  Motors, your seniority expires after four more months
24  because if you are on layoff, is that correct? Is that

Page 75

1   how you understand it?
2       A.  Yeah, but the only reason why I'm using that is
3   to explain to the deposition taken for retaliation is
4   that I was an hourly worker. I was never a temporary
5   worker. Okay. Temporary and hourly are two different
6   things. So I'm using that as comparable to an hourly
7   worker.
8       Q.  Have you ever seen in the contract that it says a
9   person -- let me stop for a second. Strike that last
10  question. I'm sorry.
11          How were you paid when you worked at General
12  Motors?
13      A.  Hourly salary, every Thursday.
14      Q.  And when you say "hourly salary," you mean for
15  every hour you worked you were paid a certain amount of
16  money?
17      A.  Exactly.
18      Q.  So you were paid on an hourly basis?
19      A.  Basis.
20      Q.  Whether it be $10 an hour or $11 an hour?
21      A.  That's correct.
22      Q.  Were you ever placed on salary?
23      A.  No. Just hourly worker like everybody else up
24  there.

Page 76

1       Q.  Okay.
2       A.  I think salary, salary persons are persons who
3   work in the office or something. I'm not sure. I got to
4   look at the contract.
5       Q.  I'm going to hand you what has been marked as
6   Deposition Exhibit 3. Do you see that document?
7       A.  Yes.
8       Q.  And is that document denoted as the complaint in
9   case 06-669?
10      A.  That's correct.
11      Q.  If we turn to the second page of Deposition
12  Exhibit 3, under paragraph 9 it says: "Charging party
13  claims that respondent" -- and I'm sorry. Let me back up
14  for a second.
15          This document was filed on October 30th of
16  2005, correct?
17      A.  That's correct. But the judge had consolidate
18  these, as you remember.
19      Q.  Thank you.
20      A.  Okay.
21      Q.  I understand.
22      A.  Let's get that clear. I want to be clear.
23      Q.  Focus on Deposition Exhibit 3. Under paragraph
24  9, am I reading this accurately where it says: "Charging

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 77

1  party claims that respondent's information during an EEOC
2  investigation has revealed further adverse action in the
3  form of retaliation because the information GM had listed
4  med as a temporary employee (in which it is false)."
5      Did I read that accurately?
6      A.  Yes.
7      Q.  The next sentence says:  "During a legal
8  proceeding, Dave Bull, GM's EEOC representative, gave an
9  affidavit stating I was an hourly worker and under
10  agreement acquired certain seniority rights under the
11  previous bargaining agreement."
12      Did I read that accurately?
13      A.  That's correct.
14      Q.  The next sentence says:  "(To this Court) From
15  the Records of GM.  See copy charging from (DOL)
16  attached.  Exhibit A."
17      A.  That's correct.
18      Q.  And in this you say that your discrimination is
19  based on race?
20      A.  That's correct.
21      Q.  You say you want your job back, back pay, and
22  money for pain and suffering.
23      A.  That's correct.
24      Q.  You haven't worked at General Motors since 1982,

Page 78

1  correct?
2      A.  That's correct.
3      Q.  Dave Bull's affidavit that's been marked as an
4  exhibit is dated from 1992, correct?
5      A.  That's correct.
6      Q.  The information that you allege formed the basis
7  of whatever this new complaint is that's been marked as
8  Deposition Exhibit 3 relates to information provided to
9  the EEOC that you deemed to be inaccurate, correct?
10      A.  From the information as far as retaliation and my
11  job status, yes.
12      Q.  Okay.  What about providing what you allege is
13  inaccurate information to the EEOC forms the basis of a
14  retaliation claim?
15      A.  Well, they list me -- again, they listed me as
16  temporary, and temporary employee doesn't get any
17  benefits or union benefits, and also terminated, which it
18  clearly shows, record shows I was laid off.
19      You know, as again, as again stated,
20  temporary employees do not get recalled back.
21      Q.  Are you aware of any changes to your record since
22  you left in 1982?
23      A.  Yes.  This information here, September of 2005.
24  According to records of Dave Bull, I was hourly worker

Page 79

1  and I was laid off.  This comes up saying I was a
2  temporary worker.  I worked my 90 days and paid my union
3  dues.
4      Q.  Sir, when was the last time you paid union dues?
5      A.  Well, back then I paid union dues at the time.
6  Temporaries don't pay union dues because they are
7  temporary.
8      Q.  When was the last time --
9      A.  That was probably way back in '82, '83.  Still
10  the fact remains that I paid my union dues and I worked
11  the required 90 days.
12      Q.  Okay.  How is that retaliation?
13      A.  Retaliation -- like I just told you for the
14  second, third time, temporaries don't even get any
15  benefits.  Temporary.  I lost union benefits.  I lost
16  some type of pension plan for the union, C sub benefits
17  because when they list you as temporary, I have a copy of
18  that.  If you don't mind, if I can bring that out --
19      Q.  No.  You have to do that on your own time.
20      A.  Okay.
21      Q.  Answer this question, sir:  What actions did
22  General Motors take in 2005 that you allege retaliated
23  against you?  Is it simply providing a statement to the
24  EEOC?

Page 80

1      A.  No, no.
2      Q.  Who else did they provide information to or do
3  something in October that relates to the October 2005
4  complaint?  That's what I want to know.
5      A.  What I'm trying to tell you, again, they list me
6  as terminated.
7      Q.  When did they list you as terminated?  Let's try
8  that.
9      A.  I don't remember.  This is the records at the
10  EEOC.  Evidently, it had to be shortly some time when I
11  filed that complaint in April of 2005, and this came up
12  after they did their own investigation.  I never knew
13  about this.  Okay.
14      Like I said, Dave Bull had a letter --
15  exhibit -- can I use that exhibit?
16      Q.  It is Exhibit 10 you have now shown me.  We
17  understand what Exhibit 10 says.
18      A.  Dave Bull says I was hourly worker and I was laid
19  off.
20      Q.  Are you aware of any new affidavit other than the
21  one that Mr. Bull has done?
22      A.  Well --
23      Q.  In 1992?
24      A.  No.  That is the records from Dave Bull to Judge

20 (Pages 77 to 80)

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 81

1  Farnan, affidavits to the judge, sworn statement, two
2  affidavits to Dave Bull -- to the judge.
3     Q.  Are you aware of any statements that Mr. Bull or
4  anyone else on behalf of General Motors has made to
5  anyone in 2005 that form the basis of your lawsuit?
6     A.  Can you say that again?
7     Q.  Okay.
8          When were you -- you listed some benefits, C
9  sub, retirement and other things.  When were you denied
10  those benefits?
11    A.  Oh, that was like -- I found out through
12  federal -- Fidelity they sent me a letter asking me do I
13  want to know what my 401(k) is doing.  This is all how
14  this all came about.  And I said --
15    Q.  Okay.  But, sir, when did you get this letter
16  from Fidelity?
17    A.  Back in around 2005, somewhere around that period
18  of time.
19          So they told me, well, Mr. Anderson, General
20  Motors got you listed as terminated, so you lose all
21  those benefits and stuff.  And C sub, C sub is where they
22  pay you sub while you off on layoff or indefinite layoff.
23    Q.  Have you received any payments from General
24  Motors while you were --

Page 82

1     A.  No.  That's the issue.  I worked my 90 days and
2  never got a payment from them.  And C sub told me General
3  Motors got me listed as terminated.
4     Q.  Who did you contact at C sub?
5     A.  The analyst department at the Fidelity, Mr. --
6  what was his name?  I have that information in my
7  briefcase here.
8     Q.  Have you produced any information on
9  communications with Fidelity?
10    A.  Yes, yes.  And also I got a letter from --
11    Q.  Who did you give that information to?
12    A.  I faxed it -- can I get that?
13    Q.  Sure.
14    A.  Because my recollection... Steven Ries, first
15  name Steven, Ries, R-I-E-S, last name.  He is analyst for
16  Fidelity.  Now, this was October the 9th, '07.  I spoke
17  to him about this C sub.  It says here --
18    Q.  Wait.  Let me ask you this question:  From the
19  time you were discharged in 1982 to 2007, had you ever
20  received any C sub benefits?
21    A.  None.
22    Q.  Had you ever received any benefits from General
23  Motors?
24    A.  No.

Page 83

1     Q.  So from 1982 to this date in 2007 you hadn't
2  received any benefits from General Motors?
3     A.  No, no.  I have a contract with the union because
4  I was an hourly worker.  They know it.  And it says
5  eligibility for C section, says your definite layoff from
6  General Motors must have commenced prior to
7  October 1st, 1990, and you must remain continuously off
8  from General Motors thereafter.  And I was laid off in
9  '82.  As you see, Dave -- Dave -- this was sent to the
10  department of eligibility at Fidelity.
11    Q.  Did you request that information from Fidelity?
12    A.  I have the union book.  When you become a member,
13  you get a union book.  Here is my union book.  Once you
14  become a member they give you.  When you work there for
15  90 days, they give you the union book.  This is the union
16  book.  This is the collective bargaining book I was
17  talking to you about earlier.
18          See?  You get all that when you become a
19  union.  Temporaries don't get none of that.  None at all.
20  They just temporary help.  They don't give them that.
21  Hourly workers get that.
22          And I sent this copy, also, to state
23  insurance commissioner, which is handling this matter for
24  me, the eligibility for C sub and E sub.  It says here

Page 84

1  continuing sub benefits C sub and extended sub benefits,
2  E sub.
3     Q.  But you never received C sub benefits?
4     A.  I didn't receive anything.  That's the whole
5  thing, chief.  I didn't receive anything.
6     Q.  You didn't go to anyone in 1989 or 1983 or 1992
7  or any year between 1982 when your employment ended and
8  the present until that letter about the --
9     A.  Well, the information I was gathering, and the
10  information that I got here, it wouldn't lead because
11  they got me listed as temporary and terminated and I
12  didn't get anything.
13          Like I said previous, the only reason I
14  brought this up, I received a letter from Fidelity
15  telling me that, Do you want to know what your old 401(k)
16  is doing?  I called them up on the phone and they said
17  you can't get any benefits because General Motors got you
18  listed as terminated.  I said, "They did what?"
19  Retaliating against me.  See, I was entitled to C sub and
20  all those benefits.
21    Q.  Where is the letter from Fidelity?
22    A.  Let me see about that.  Here.  Right here.  And
23  there is another letter here I want you to see.  Let me
24  see here.  Here it is here from the benefit -- General

21 (Pages 81 to 84)

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 85

1  Motors, up here in the corner.
2      Q.   Okay.
3      A.   That's what exhibit?
4      Q.   Where is the rest of this?  This is a cover sheet
5  to a package that was probably mailed to you?
6      A.   It wasn't a package.  Let me see that.  I'm going
7  to tell you.  It wasn't a package.  It was to show you I
8  was an hourly employee.  This deals with my pension plan.
9      Q.   That's the only document they sent you in there?
10     A.   From the -- yeah.  From that it is.  And then I
11  also got this here from Fidelity about the 401(k).
12          Temporaries don't get none of those
13  benefits.  You had to be hourly worker to get that stuff.
14     Q.   Sir, this letter is dated March 9th of 2005?
15     A.   Right.  That's what I just told you.  It was back
16  in 2005 when I received that letter telling me I have a
17  401(k).  That's when I decided to look into this.  And I
18  asked them were they doing any hiring.  And I went to the
19  Department of Labor and this is what they revealed.  They
20  told me beforehand --
21     Q.   Sir, show me on this where it says you have
22  information about your 401(k) on here.
23     A.   It says here website wwg401k.com.  This is the
24  information that you go look in to see if you have

Page 86

1  401(k).
2      Q.   This says that you applied for a pin number?
3      A.   Yes.  Well, pin number.  They use its pin number
4  when you go into your account.  Like any other account,
5  they give you a pin number or you make it up to go into
6  your account.
7      Q.   Did you go into this account?
8      A.   Yes.  And every time I called there, it tell --
9      Q.   What did the account show?
10     A.   Well, I'm going to explain it to you now when I
11  called there.
12     Q.   No, no, no.  You have to answer my question.
13          What did the account show?
14     A.   It didn't show anything because I couldn't get in
15  there.  That's what I'm trying to tell you.  I couldn't
16  get in.
17     Q.   Could it be because there was no account because
18  it didn't exist?
19     A.   No.  It didn't say that.  I'm going to tell you
20  what the recording says.  The recording says that
21  "Unavailable for calculation at this time."  Because we
22  are talking about '82.  It says "Unavailable for
23  calculation at this time."  And I've been dealing with
24  these Fidelities ever since then.

Page 87

1          And also the pension, so they sent me this
2  information, they told me about Fidelity, back in March
3  of 2005, they told me that, Mr. Anderson, General Motors
4  got you listed as terminated.  So, therefore, you don't
5  get any benefits.
6          That's the reason why I went on and did what
7  I had to do, did this investigation and this pops up,
8  Exhibit 4, temporary and hourly employee.
9          There is all the documentations here from
10  benefit center proving I was hourly employee.
11     Q.   Just for the Court's edification, this is marked
12  as Anderson Exhibit 9, and I will reference to the Court
13  that at one corner it says appears to be October 5, 2007,
14  has Roland Anderson and address says:  "Re:  Hourly
15  Employee Pension Plan," the plan, and has Roland Anderson
16  and then has a big blank.  There appear to be no other
17  documents or information.
18     A.   Well, I that information --
19     Q.   Provided with this --
20     A.   I can bring --
21     Q.   You can't talk while I'm talking.
22          That are provided with Deposition
23  Exhibit 9, just what appears to be a cover sheet to a
24  mailing?

Page 88

1      A.   Well, the information that was here pertains to
2  hourly employees, just to show justification that I
3  wasn't a temporary or terminated.  That's all this letter
4  states.
5      Q.   Is there anything else that forms the basis of
6  the complaint that has been marked as Deposition
7  Exhibit 3?
8      A.   Okay.  According to the Department of Labor, this
9  is, upon their investigation, what they found.
10          Like I said earlier, privacy act statement,
11  "The authority for requesting the personal information
12  contained herein are provided in 42 USC 2000e(9), 29 USC
13  201, 29 USC 621; and 19 Delaware Code 712."
14          Okay.  These are the -- their findings upon
15  the information that I had presented to them, like we are
16  at his deposition, same information was provided to them
17  at that time, as requested from -- from the Department of
18  Labor, entering charge number 06020096W, and the EEOC
19  Philadelphia charge number 17CA600275.
20          This is upon their own investigation.  And
21  false information was presented to them on Exhibit 4,
22  September the 8th of being terminated, and then they said
23  temporary.  Two different things here.
24          Anyway, and information was sent by Dave

22 (Pages 85 to 88)

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 89

1  Bull, Exhibit 10, clearly states that I was an hourly
2  worker. And also Exhibit 9, from GM Benefits Center
3  clearly states I was an hourly rate, make sure, hourly
4  rated employees' pension plan.
5       Now, that letter is only to verify, to show
6  income coherent with the allegation of General Motors
7  stating I was a temporary.
8       And what else they got here? I was
9  temporary and terminated employee. This clearly states I
10 was an hourly rated employee, from these two letters from
11 Fidelity and from General Motors Benefit Service Center.
12  Q.  Okay, sir.
13  A.  Thank you.
14  Q.  What about General Motors telling the EEOC that
15 you were terminated as opposed to laid off as you allege,
16 affected -- okay.
17       What about General Motors telling the EEOC
18 that you were terminated as opposed to laid off as you
19 contend had any adverse action -- strike that.
20       It is your allegation that General Motors
21 told the EEOC that you were terminated and not laid off,
22 correct?
23  A.  The allegations are the facts that what was
24 discovered from the EEOC.

Page 90

1  Q.  Is that a yes or no?
2  A.  Yes.
3  Q.  What about that statement to the EEOC affected
4  your employment or the money you were getting or anything
5  in 2005 when you filed this complaint?
6  A.  I don't understand the question. But I'm going
7  to explain that to you again, sir.
8  Q.  What changed after you got that letter dated
9  September 8, 2005, and before what was different?
10  A.  Okay. Okay. Okay. The difference is that they
11 listed me as terminated, and terminated, they do not get
12 any benefits.
13  Q.  Okay, sir. Let me stop you.
14       Were you getting any benefits from September
15 8th, 2005?
16  A.  The reason why --
17  Q.  Yes or no?
18  A.  No.
19  Q.  Were you getting any benefits after
20 September 8th of 2005?
21  A.  No.
22  Q.  Were you getting any C sub or any kind of other
23 payments from General Motors before September 2005?
24  A.  No, and the reason why is --

Page 91

1  Q.  Yes or no?
2  A.  No.
3  Q.  And after that date you weren't receiving any
4  benefits?
5  A.  No.
6  Q.  So nothing about the benefits that you were
7  receiving changed?
8  A.  Because it was incorrect job status. This the
9  reason why Fidelity told me, again, told me that -- they
10 sent me a letter about the 401(k) and then I called them
11 up on the phone and I had questioned them. And then I
12 also called the pension up. Oh, General Motors has you
13 down as terminated. I didn't get any benefits. Again, I
14 told you, temporary and -- temporary and terminated.
15 Don't get any benefits.
16  Q.  Sir, that doesn't address my question.
17  A.  The question is no, I didn't get any benefits
18 because --
19  Q.  You haven't gotten any benefits for 20 years?
20  A.  No, because of that -- these are the reasons.
21 Now I'm finding out later on because the letter from Dave
22 Bull had written saying I was laid off from hourly
23 worker.
24       Now, as of 2000 -- September '05, they said

Page 92

1  I was temporary and terminated after the information I
2  had talked to Fidelity about this letter dated March 9.
3  Q.  Sir, Mr. Bull said your employment expired on a
4  time-for-time basis after that, too, didn't he?
5  A.  Okay. Yes, because the fact of it was I was on
6  an hourly worker. I wasn't temporary. I wasn't laid
7  off. Okay.
8       Now, you keep wanting the agenda that we
9  hear from Judge Farnan is the allegation of retaliation.
10 Now, I have a copy from Mr. -- I mean Judge Farnan's
11 order that was sent to me the other day for retaliation.
12 That's what we are here for. We talking about this
13 letter here.
14       Now, terminated and temporary involves my
15 benefits.
16  Q.  That you hadn't received ever?
17  A.  I know I was still entitled to them according to
18 these people. General Motors got me listed. That's the
19 reason why it was retaliation. They put me down as
20 terminated and temporary. I don't get none of these.
21  Q.  Sir, did you file a complaint with the NLRB with
22 regard to the union --
23  A.  Yes.
24  Q.  -- not fighting for you to get these benefits?

23 (Pages 89 to 92)

EX. 1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 93

1    A.  This is what they said.  If you want me to
2  explain --
3    Q.  Yes or no?
4    A.  Yes.
5    Q.  And in that you were denied any benefits by the
6  NLRB, correct?
7    A.  That's correct.
8    Q.  And you were denied any benefits by the
9  international union?
10    A.  Yes.
11    Q.  And you were denied benefits by the local union?
12    A.  Sir, that doesn't make --
13    Q.  Yes or no?
14    A.  Yes, I'm going to explain something to you.
15    Q.  Sir, you have to answer my questions, and then at
16  the end if you want to explain for hours, she will be
17  more than happy.
18    A.  Okay.
19    Q.  But we are now getting to the point where you are
20  not answering questions and you are again talking over
21  me.
22       If you were denied benefits by the local
23  union and the local union refused to file a grievance,
24  you were denied benefits and deny the right to file a

Page 94

1  grievance by the international union and the NLRB denied
2  you any benefits or the right to file a grievance, how is
3  that different than what you are trying to pursue now and
4  saying you should have gotten benefits?
5    A.  Again, the date of this letter, Deposition 4,
6  September 2008, this was revealed.  Okay.  This was
7  revealed.  The letter that we received from Dave Bull to
8  the judge clearly shows that I was an hourly worker.
9       Now, the answer to your question why didn't
10  I get paid, maybe because they was going on this and
11  that's the same thing with Fidelity went on, false
12  information.  I was an hourly worker.  Okay.  And that
13  fact of -- the fact remains today until I get that
14  changed.  You can call Fidelity.  You can call all these
15  people up.  Exhibit 9 clearly states that I was an hourly
16  worker.  Exhibit here, 401(k), pin number.
17       Now, the information was probably fed to
18  them, this.  I didn't know anything about it.  Because it
19  wasn't sent to the courts.  It was sent to these
20  individuals.  This is where it first started from,
21  Fidelity.  That's how it started.  It was never sent to
22  the courts.
23       If so -- listen.  If so, Dave Bull would
24  have made that statement to the judge himself.

Page 95

1    Q.  Sir, when was this information allegedly provided
2  to Fidelity?  Do you know a date?
3    A.  Well, they told me sometime -- they are not at
4  liberty to tell me.  Only time I found this out, when
5  they sent me this letter way back in 2000.  I'm curious.
6  There is the letter right here.  I said let me check on
7  this.  That's when it came up.
8       They told me, my hand to God, they said
9  that, Mr. Anderson, they got you down as terminated.  You
10  don't get any benefits.  I said, "Wait a minute.  I was
11  an hourly worker."  Until General Motors changed that,
12  until they changed that, that's the only reason why I
13  wanted to get this taken care of.
14       I'm not worried about the suit.  I want
15  justice.  I worked my 90 days in.  And they said
16  theirself that I was entitled to these types of issues
17  and benefits from the union contract once you reach the
18  90 days.  That's the same thing as you, yourself, work
19  90 days.  Don't you want your benefits?
20    Q.  Who at Fidelity told you you were entitled to
21  benefits?
22    A.  In this section, from this section here,
23  "Confirmation of activity.  Please contact us if you wish
24  to make transactions."  This is the part you didn't read,

Page 96

1  inquiring on your account.  You understand me.  You
2  didn't read that.  I'm going to read this now or ask
3  questions regarding this confirmation.
4       And I called because of this confirmation.
5  That's when they told me, "Hey, Mr. Anderson, they listed
6  you in the computer as terminated, so you don't get any
7  benefits."
8    Q.  You haven't worked since when?
9    A.  Sir, it doesn't --
10    Q.  Sir, answer the question, please.
11    A.  I haven't worked since 1984, '85.
12    Q.  Since 1984 you were on Social Security
13  disability?
14    A.  Yes, because of my nerves.
15    Q.  In order to get Social Security disability, you
16  have to certify to the federal government that you are
17  incapable of working, correct?  Yes or no?
18    A.  Yes, I have --
19    Q.  And you actually have to have a medical doctor
20  certify that you are incapable of working, correct?
21    A.  That's correct.  I have --
22    Q.  Stop.
23       Have you gotten any certification from any
24  doctor allowing you to return to work?

24 (Pages 93 to 96)

EX.  1

Anderson v. General Motors Corporation
Roland C. Anderson

Page 97

1    A.  I have a situation where I talked to the doctor
2  about possibly working part-time or doing something. I
3  need to do something. My nerves jittery like it is. My
4  doctor put me on situation and I spoke to the doctor and
5  it is possible that I can probably just work part-time or
6  do something.
7    Q.  When did you speak to the doctor?
8    A.  Oh, this is way back, around '83, '84, the doctor
9  is now dead.
10    Q.  And since then have you ever talked to any doctor
11  about returning to work full-time?
12    A.  Well, not exactly.  But I want to go back to work
13  and do something.  That's the reason why I called up
14  General Motors to see if they were accepting any hiring
15  under curiosity.
16    Q.  Have you applied anywhere else for full-time
17  employment?
18    A.  No, I haven't.
19    Q.  Have you told the federal government you think
20  you can go back to work?
21    A.  They understand what the doctors are saying, that
22  I can work somewhat, so many hours and this and that.
23       Plus I do have an injury from a car
24  accident.  Dr. Atkins.  I had problems with my back.  He

Page 98

1  said that I can probably work so many hours.  That's it.
2  I'm saying I have documentation through that.
3    Q.  When was the car accident?
4    A.  2004.
5    Q.  And did you sue anyone over the car accident?
6    A.  Yes.  And we won.
7    Q.  How much did you win?
8    A.  Well, sir, I'm not at liberty to tell you the
9  amount that we received.
10    Q.  Was it a jury verdict or settlement?
11    A.  Jury verdict.
12    Q.  Then, sir, there is no confidentiality with
13  regard to a jury verdict.  How much was the verdict?
14    A.  Well, it was awarded for court costs, $5,189.
15    Q.  Anything else?
16    A.  Plus a hundred dollars for pain and suffering.
17  And now that's still on appeal in United States Supreme
18  Court.
19    Q.  Why is that on appeal?
20    A.  Because the -- the jury didn't believe -- didn't
21  believe the doctors, but yet still gave the doctors
22  $5,189 and gave me a hundred dollars.
23       That doesn't -- doesn't work that way.  Now,
24  the doctor says I got problems with my back.  I got a

Page 99

1  bulging disk in my back from the x-rays and INGs and all
2  that.  There is a bulging disk in my back hitting my
3  nerves, making me a little jumpy a little bit.
4       And the doctor has presented this in front
5  of the jury.  The jury gave the doctors $5,000 and didn't
6  give me but a hundred dollars.  That's on --
7    Q.  Were you represented by an attorney in that?
8    A.  Yes.  Mr. Larry Ramunno.
9    Q.  And Mr. Ramunno filed the appeal to the Supreme
10  Court or did you?
11    A.  I had to file the appeal to the Supreme Court to
12  protect my rights.
13    Q.  Did you file an appeal to the Third Circuit?
14    A.  No.  United States Supreme Court, that's where it
15  is at now.
16    Q.  How long ago was that appeal filed?
17    A.  This is about four or five months ago and they
18  accepted -- what is that for appeal to Supreme Court
19  cerit -- something.
20    Q.  You can call it cert.
21    A.  Cert.  Cert.
22    Q.  So they accepted cert without it ever being heard
23  by the Third Circuit?
24    A.  Well, the disciplinary from the state courts, it

Page 100

1  goes to Supreme Court.  From the Supreme Court it goes to
2  their United States court.
3    Q.  So you did, you filed this in state court?
4    A.  State court.  Larry Ramunno filed it in state
5  court.
6    Q.  You appealed it to the state appellate court?
7    A.  Yes, Supreme Court.
8    Q.  Did Larry do that or did you?
9    A.  Well, it was simple appeal.  I did it.
10    Q.  Okay.  And you lost at the Supreme Court?
11    A.  Yeah, because said it didn't have any -- what did
12  he say?  Oh, he was saying that, he was saying it was
13  only one mention of spasm in the complaint, and here the
14  doctors listed five, six situations going on with my
15  back.
16       So I had to appeal that to Supreme Court,
17  United States, showing that I had ligaments tore in my
18  back from the x-rays and everything.  The court, Supreme
19  Court never, never addressed that.  They said that only
20  thing they see in here, they read one deposition from a
21  doctor, Dr. Frisco, and he said that's all he sees in
22  here is one spasm, mentioned spasms.
23       But Dr. Bandera, Dr. Atkins, Dr. King, I
24  still got problems with my back.  I take medicine, pain

25 (Pages 97 to 100)

EX. 1

Anderson v. General Motors Corporation
Roland C. Anderson

**Page 101**

1  pills. And Dr. Frisco and Dr. Rooney, they all said --
2  even their own doctor, Dr. Bonner, all agreed I have
3  something going on, bulging disk and ligaments were tore
4  from the x-rays and everything.
5          But yet and still, Supreme Court turn around
6  and said they only seen one spasm, and so I had to appeal
7  it.
8          And then United States Supreme Court said
9  that they accepted that information and they told me,
10  sent me a letter, sent to the other side for telling them
11  that this thing is going to be docketed and it is going
12  to go, move forward.
13  Q.  Okay.
14  A.  Because I do have problems with my back.
15  Q.  Has any doctor certified with regard to your
16  back that you could go back to work?
17  A.  Well, my doctor, Atkins, says that I could work
18  part-time or whatever, so many hours.
19  Q.  Based on your back?
20  A.  Based on my back.
21  Q.  And then you can only work part-time based on
22  certain --
23  A.  Certain type of jobs.
24  Q.  Did you ever ask him if one of those jobs is at

**Page 102**

1  General Motors?
2  A.  Yes. I told him I was electrician. He says -- I
3  guess he meant any job, really. But not to do too much
4  strenuous to my back, lower back.
5  Q.  Okay. So could you do full-time production work?
6  A.  No, I don't think I can do that.
7  Q.  Could you do full-time production work in 2005?
8  A.  In 2005 -- 2004 the accident happened. No, I
9  couldn't. But the fact of it is I could have done other
10  things. Driving cars. They drive. Or working behind
11  the desk a little bit, you know. Something that the
12  doctors can prescribe for me to do instead of doing
13  production work. I know when I do little things around
14  the house and yard things, like I was pulling some things
15  the other day, my back aching, I take pain pills.
16  Q.  Do you know if they hire new employees for
17  driving cars or are those bid jobs?
18  A.  I never even got past the phone, sir. I wish I
19  did know.
20  Q.  So you don't know that?
21  A.  Well, the fact of it is, I didn't have the
22  opportunity to find out. Wasn't even allowed on the
23  premises. I called. They said, "You washed up." Hang
24  the phone in my ear. Sorry. Hung the phone in my ear.

**Page 103**

1          So I wanted to do that. I still do. I
2  still do. On a situation.
3  Q.  Have you contacted Social Security disability and
4  told them you think you can go back to work so they stop
5  making the disability payments every month?
6  A.  Well, I spoke to the doctor and the doctor is
7  going to have to do that.
8  Q.  When is the doctor going to do that?
9  A.  I don't know yet. I got to go back to him.
10  Right now the doctor says he can't do nothing for me
11  because of my situation in my back. But I will go back
12  to him if it is necessary and get a letter. I'm willing
13  not to work on the line, not to work on the line. I want
14  something to do on the job.
15          All folks don't have jobs here. And it is
16  reality. And you can check the ratio of minorities up
17  there compared to whites. I see cars from Pennsylvania,
18  New Jersey, Maryland. Whites. Little, one, two
19  sprinkles of blacks. That ratio is terrible up there,
20  you know.
21          So bad they had to get a guy that is civil
22  rights leader up there and I gave him the information
23  showing by Dave Bull and his letter and comparing to
24  this. He ain't never got back in contact with me.

**Page 104**

1          I call there constantly to the union, talk
2  to the president. They ain't doing nothing.
3          Our community is kind of run down trying to
4  be built back up. And the majority are blacks, standing
5  on the corner like you see everywhere, trying to gets
6  jobs.
7          You see all these nice-looking trucks come
8  around here, boys from Pennsylvania with the confederate
9  flags and everything on them coming riding by.
10          By rights those jobs are supposed to be the
11  ones to the nearest, just like they do in the city.
12  Supposed to be to us in this community. It is not
13  happening. It is all a mirage. All fairy tales. Oh, we
14  hiring. Check for yourself and you see that there is a
15  difference in ratio of hiring minorities.
16          Yes, I want to go back to work. I'm tired.
17  You understand me. I'm tired of living in poverty and
18  not making it hardly. Scrounging every day. Call up to
19  the union. I'm begging them. I want a job. I can
20  probably drive cars. They don't even let me get on the
21  phone to ask them if they doing any hiring or anything.
22  They keep on saying October. Last time we hire any
23  people, October 1999. And clearly exhibit shows that
24  they hired people all the way from '81 all the way up

26 (Pages 101 to 104)

Wilcox and Fetzer, Ltd.                 Registered Professional Reporters                 302-655-0477

EX.  1